# JOE LANE v. STATE.

No. A-9486. Nov. 3, 1938.

(84 P. 2d 807.)

Tillman & Tillman, of Pawhuska, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Sim T. Carman, Co. Atty., of Pawhuska, for the State.

BAREFOOT, J. The defendant was charged in the district court of Osage county with the crime of assault with a dangerous weapon, was convicted and sentenced to serve a term of two years in the penitentiary, and has appealed.

The first assignment of error is that the court erred in giving instruction No. 10, which is as follows:

"You are instructed that if you find from the evidence, facts and circumstances in proof, beyond a reasonable doubt, that the defendant herein armed himself for the purpose of making an assault upon the prosecuting witness, with the intention then and there existing in his mind to kill or do great bodily harm to the prosecuting witness, and if you further find that under such situation he pointed the gun at the prosecuting witness with the result that said gun was accidentally discharged, then and under such circumstances the fact, if you find it to be a fact—that said gun was accidentally discharged would be no defense to the commission of the crime charged in the information."

This instruction should be considered together with all the instructions given by the court, and especially with instruction No. 9, which was as follows:

"The defendant herein claims that, upon the occasion complained of in the information, he armed himself for the purpose of defending himself against an assault upon the part of the prosecuting witness; and that, while so armed, he accidentally discharged his gun, which resulted in the injury to the prosecuting witness.

"In this connection, you are told that under the law of this state, every person has the right to defend themselves from an attack or threatened attack from any person or persons. And in this connection, you are told that if the defendant herein, in good faith, armed himself for the purpose of defending himself against an attack upon the part of the prosecuting witness and that the gun which he held in his hands was accidentally or unintentionally discharged, without any unlawful intent upon

the part of the defendant to kill or injure the prosecuting witness, then and under such circumstances it would be your duty to find the defendant not guilty."

It will be noted that in instruction No. 9, the court, in a clear and concise manner, presented to the jury defendant's theory and contention. He informed the jury that if defendant armed himself for the purpose of defending himself from an assault by the prosecuting witness, and that while so armed, he accidentally discharged his gun without any unlawful intent on his part, and the prosecuting witness was injured thereby, that it would be the duty of the jury to find the defendant not guilty. By instruction No. 10, the court informed the jury that if defendant armed himself for the purpose of making an assault upon the prosecuting witness and that there existed in his mind the intention of killing, or doing great bodily harm, and as a result of this he pointed the gun at the prosecuting witness and it was accidentally discharged, that this would be no defense to the commission of the crime charged in the information. This is a true statement of law and does not, in our opinion, place the burden of proof upon the defendant, nor does it take away the right of the jury to pass upon the question of intent. It leaves the jury to pass upon the question of intent as presented by the facts in this case. Where the defense is based upon accidental death or injury to come within the terms of the statute of excusable homicide by misadventure all of the authorities agree that three elements must be present. First. The act resulting in death or injury must be a lawful one. Second. It must be done with reasonable care and due regard for the lives and persons of others. Third. And the killing must be accidental and not intentional. All of these elements must exist before the defendant is entitled to the protection of the statute on accidental death by misadventure. The rule is stated in 30 C.J., p. 88, as follows:

"Even though the homicide is unintentional, it is not excusable where it is the result or incident of an unlawful act, such as pointing or presenting a gun, pistol or other firearm at another person in such a manner as to constitute an offense under the laws of the state." Wharton on Homicide, sec. 358, p. 571; Barnes v. State, 134 Ala. 36, 32 So. 670; State v. Benham, 23 Iowa, 154, 92 Am. Dec. 416, 417; Sanders v. State, 16 Ala. App. 511, 79 So. 504; Lundsford v. State, 2 Ala. App. 38, 56 So. 89; Lewis v. State, 96 Ala. 6, 11 So. 259, 38 Am. St. Rep. 75; People v. Venckus, 278 Ill. 124, 115 N.E. 880; McDaniel v. State, 156 Ala. 40, 46 So. 988, 21 L.R.A. (N.S.) 678, 130 Am. St. Rep. 74; State v. Reese, 25 Del. 434, 2 Boyce 434, 79 A. 217; Kent v. State, 8 Okla. Cr. 188, 126 P. 1040; Palmer v. State, 17 Okla. Cr. 220, 187 P. 502.

The statute of this state makes it unlawful to point a gun at another. Section 2591, Okla. Stats. 1931, Okla. St. Ann., tit. 21, § 1279.

We have carefully examined the cases cited in defendant's brief and they lay down the rule that there must be a felonious intent to commit a crime, but they are in no way in conflict with the rule above announced. The court in the instant case instructed the jury under section 1873, Okla. Stats. 1931, Okla. St. Ann., tit. 21, § 652, as charged in the information, where one attempts to shoot at another with intent to kill, and also instructed the jury under section 1870, Okla. Stats. 1931, Okla. St. Ann., tit. 21, § 645, where one commits an assault upon the person of another, or shoots at another with intent to injure another such person, but without intent to kill. The jury found the defendant guilty under the last charge and his punishment was assessed thereunder. Crain v. State, 24 Okla. Cr. 343, 217 P. 888. From an examination of the court's instructions as a whole, we do not find that defendant was prejudiced thereby. They fairly presented the law of the case and gave to the defendant every right which he had under the law.

It is next contended by the defendant that the court erred in refusing to grant the motion for continuance filed in this case. The motion was as follows:

"Comes now the defendant and moves the court to continue the case against him for the following reasons:

"1. That he has heretofore caused a subpoena to be issued for the witnesses Earl Thomas and Bell Thomas, and that subpoena has not been returned so that the defendant is unable to state whether the witnesses have been served or not, but they are not present and defendant says that he has been informed that they are not in Osage county. That he has been served with a copy of a statement given by them, which statement is different from the sworn testimony of the witnesses given at the preliminary hearing, and that said testimony is material and competent and can not be proven by any other witness and that if present the said witnesses would testify substantially as follows:

" 'That they were present at the time of the alleged shooting, and that the said Beebe Morton was advancing upon the said Joe Lane in a menacing manner and had followed said Joe Lane into the house and had threatened him and was attempting to carry out said threat at the time of the shooting. That he was acting in an angry and boisterous manner.' That this request for continuance is not asked for the purpose of delay, but that substantial justice may be done the defendant."

Okla. Stats. 1931, sec. 397, Okla. Stats. Ann. tit. 12, sec. 668, provides what is necessary to secure a continuance because of the absence of a witness. The same statute applies to civil and criminal cases. Oklahoma Statutes 1931, section 3055, Oklahoma Statutes Annotated, title 22, section 584. A reading of the motion for continuance filed in this case does not comply with the requisites of the above statute, and as the same has been construed by the holdings of this court. The affidavit does not show that due diligence was used to secure the attendance of the absent witnesses. It only says that affiant has been informed that they are not in Osage county. The application shows that the witness testified at the preliminary examina-

tion. It is not shown whether the testimony was taken at that time and transcribed. If so, it would have been available upon proper showing. It does not show the probability of being able to secure the witnesses within a reasonable time. In fact, there is nothing to show due diligence on the part of the defendant to secure the evidence of these witnesses. Merely having subpoenas issued for a witness is not due diligence. Affiant says that if the witnesses were present, they would testify "that they were present at the time of the alleged shooting", and that the witness Earl Thomas would testify that the said prosecuting witness Beebe Morton was advancing upon defendant and had threatened him and was attempting to carry out said threat at the time of the shooting. This evidence would be contrary to the evidence of the defendant himself who testified that the witness Earl Thomas had left the room prior to the time that the shooting occurred and was not present at that time. There was no testimony of any one that the witness Bell Thomas was at any time present during any part of the difficulty. An application for continuance is addressed to the sound discretion of the trial court, and unless there has been an abuse of this discretion, a judgment of conviction will not be reversed on appeal. We do not find that the trial court abused its discretion in this case. This court has passed upon many applications for continuance and this has been its holdings from its earliest existence. Lowe v. State, 7 Okla. Cr. 32, 121 P. 793; Seigler v. State, 11 Okla. Cr. 131, 145 P. 308; Petty v. State, 11 Okla. Cr. 438, 147 P. 782; Martin v. State, 35 Okla. Cr. 248, 250 P. 552; Herndon v. State, 35 Okla. Cr. 371, 250 P. 942; Guest v. State, 46 Okla. Cr. 228, 287 P. 818; Wagner v. State, 46 Okla. Cr. 269, 285 P. 141; Wininger v. State, 55 Okla. Cr. 78, 24 P. 2d 664.

It is finally urged that the evidence is insufficient to support the verdict in this case. This proposition is not briefed by defendant. The facts were that the defendant was the uncle of the prosecuting witness. Both were full-

blood Osage Indians. They were both residing with the mother of defendant and the grandmother of the prosecuting witness, Randall Morton, who was known as Beebe Morton. She owned an automobile and it seems that each of the boys were in the habit of driving it, and they were jealous of each other. On the day of the difficulty defendant had possession of the car on the streets of Tulsa. He had been gone several days with the car. His mother sent her grandson after it and he found defendant parked in front of a cafe in the city of Tulsa, drinking a bottle of beer. He had with him his ex-wife, Elizabeth Lane, and Earl Thomas. Beebe Morton had taken with him Joe Sisk, who was working for his grandmother. They had some words over the possession of the car, but defendant finally agreed to let Morton have the car if he would take him home. There was a dispute as to where Morton was to take defendant, but he finally took him to the country home owned by his grandmother, and upon which certain tenants were living. The defendant was staying at this home part of the time. The witnesses for the state claimed that defendant had abused and cursed him, and that when he got to the Rosa Lane place he got out of the car, and told defendant he had taken it as long as he was going to, and told him to come out of the car with his "dukes up". There was some talk and defendant finally got out of the car and went in the house and asked one of the parties for a gun, telling him that Beebe Morton and Joe Sisk were going to jump on him. This party got the gun out from under a mattress and handed it to defendant. It had one shell in it and he loaded it with another he took from a shelf. Defendant's testimony with reference to the actual shooting was as follows:

"Q. Now, tell us what you did when you went in the house? A. I walked in the house and met Lester Barnes, the man that was staying out there and I told him we were having trouble out there, and that Fat and Bee was going to jump on me, Bee took the car and Fat had a contract to drive it, and it was Fat's place to take the car

and besides I had borrowed the car and I said I will just get this gun, I said where is it, and he just went in the bedroom and got it, it was under the mattress, and I brought it out and there was a shell upon the dresser there and I just reached up and put it in. By the Court: Who got the gun, you or Barnes? A. Barnes, so I took the gun, and by that time Earl came in and went back out. By Mr. Tillman: Earl who? A. Thomas. Q. Go ahead. A. And by that time Beebe came in. Q. Where were you when Beebe first came in the house? A. Well, the kitchen sits here and the dining room and the bedroom here and I was standing right over here in the door. Q. Well, the door to what? A. The door to the bedroom. Q. All right. A. And Beebe came in from the kitchen to the dining room. Q. Now, let me ask you, did he come round in the back part of the house? A. Yes, sir. So I asked him, I said Beebe stop, I didn't have any intention of shooting him or anything, I just said stop, I asked him three times and I had the gun something like this. Q. Now, did you say you asked him— A. To stop. Q. How many times? A. Two or three times. Q. Did he stop? A. No, he just kept coming. Q. What was his condition or position at that time, with reference to whether he appeared to be angry? A. Well, he just kept coming. Q. Did he seem excited or otherwise? A. He looked like he was to me. Q. What was your thought, Joe, with reference to whether he was about to begin an attack upon you? A. Well, I didn't know, I had just—I told him to stop three times, and I just had the gun down this way and I just pulled the trigger. Q. At that time did you intend to shoot him? A. No, sir, I didn't intend to shoot him or pull the trigger either, I didn't think he would come on after I pulled this gun. Q. And the shot from the gun struck him? A. Yes, sir. The Court: Well, you say this was accidental, was that your statement? A. I didn't intend to pull the trigger when I pulled it, I thought he would stop when I pulled the gun, when he saw I had it I thought he would stop."

On cross-examination he testified:

"Q. After you got this gun and while you were still loading it, Beebe came in the room. A. Yes, sir. Q. And that is the time you shot him? How big is that room? A. It is about 14 by 12 I imagine; it is 14 this way, the way he was coming. Q. And he advanced to about the middle of

the room, hadn't he? A. Just—no, about one third of the way I guess, but when he came in the door I hollered for him to stop."

He further testified on cross-examination:

"Q. What did you shoot this boy for? A. I didn't intend to shoot him when I shot him. Q. Do you say the shot was accidental? A. Well, I just pulled it off before I knew it, because I never went hunting, I don't know anything about a shotgun. Q. You knew enough about one to load one and shoot him, didn't you? A. Yes, sir."

The testimony of the prosecuting witness was that after asking the defendant to get out of the car with his "dukes up," he told him he was through seeing him come home drunk and that he was going to protect his grandmother, and that if defendant would not come back and annoy her, he would let the matter drop. Defendant then got out of the car and went into the house, and that upon learning that defendant was going to get a gun he stepped inside the door, and as he did so defendant told him to stop, and just at that time the gun fired, and he was struck in the hand and abdomen. That he ran out of the house and defendant followed him, and he said to him, "Uncle, my God, you have shot me," and he said, "You son of a so and so, I will kill you, you can't do that to me, I will kill you." That he then pointed his gun at Joe Sisk and said, "You son of a so and so, you are next." That Joe Sisk and Earl Thomas had just come in the door after the shooting and they all ran into the yard, and the defendant pursued them with his gun still in his hands. That he ran out from the house and defendant came to where he was and he told him, "he was bleeding to death out here, let me come back," and he said, "No, go on and bleed to death." That the defendant then pursued Joe Sisk and Earl Thomas, who had fled from the house. That prosecuting witness was finally brought to the hospital at Tulsa by the ex-wife of defendant. That he remained there for a period of two months. The prosecuting witness's testimony was corroborated by the witness Joe Sisk. Both

swore that the prosecuting witness was doing nothing, or making any demonstration toward defendant before or at the time of the shooting.

Other witnesses testified that immediately after the difficulty they talked with defendant and he said in substance that he did not allow anybody to run over him. That Fat (Joe) Sisk is the one that ribbed the whole deal, and that he was the one he ought to have killed, and he would have but that he ran off.

From the above statement it is clearly seen that the evidence was sufficient to sustain the verdict. The defendant's own statement does not show that he acted in self-defense. The prosecuting witness was not armed, and was a distance of about twelve feet from defendant at the time he was shot. Under the law, if he pointed the gun at prosecuting witness and pulled the trigger accidentally, as he said he did, he would be guilty under the law.

The jury found him guilty under the statute providing for an assault without intent to kill. A judgment under the attempt to kill statute would have been upheld under the facts in this case. The defendant had a fair trial and is fortunate that the jury did not assess a higher punishment.

The judgment of the district court of Osage county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.