# MARTIN v. STATE.

No. A-11155.   Sept. 13, 1950.

(222 P. 2d 534.)

Charles E. Dierker, Oklahoma City, and William Jones, McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, A. D. Martin, who hereinafter will be referred to as defendant, as in trial court, was charged by indictment filed in the district court of Pittsburg county, with the crime of embezzlement, was tried and convicted, with punishment

assessed at imprisonment in the State Penitentiary for one year and one day.

The prosecution in this case was instituted under the provisions of section 1454 of Title 21 O.S. 1941, which reads:

"If any person being a trustee, banker, merchant, broker, attorney, agent, assignee in trust, executor, administrator or collector, or being otherwise entrusted with or having in his control property for the use of any other person, or for any public or benevolent purpose, fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, he is guilty of embezzlement."

By the terms of section 1451 of the above Title, embezzlement is defined as:

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."

The charging part of the indictment reads:

"* * * on the 31st day of May, in the year of our Lord One Thousand Nine Hundred and Forty-six, and anterior to the presentment hereof, commit the crime of embezzlement in manner and form as follows: That the said A. D. Martin was, in Pittsburg county, Oklahoma, on or about the 31st day of May, 1946, duly employed by the State of Oklahoma at the Oklahoma State Penitentiary and was assigned duties by the Warden, R. B. Conner; that said A. D. Martin was assigned to duties as secretary to the said Warden, and as Manager of one certain fund known as the Oklahoma State Penitentiary Canteen Fund, and as such employee of the State of Oklahoma and manager of said Canteen Fund, was charged and entrusted with the collection, receipt, safe-keeping and disbursement of all money, merchandise, securities, assets, property or effects, of any kind, of said fund, or belonging to said fund; that the inmates or prisoners are the owners of said fund and that the said A. D. Martin,

by virtue of his said employment, occupied the position of trustee of the said fund aforesaid for the safekeeping, transfer and disbursement of the said fund; that the said A. D. Martin as such employee of the State of Oklahoma and acting as such trustee, and while charged and entrusted as aforesaid, did in said county and state on or about the 31st day of May, 1946, have and hold in his possession and under his control by virtue of his said employment, certain funds, property, assets and effects, by him received and collected as such employee, and such funds, assets and effects, by him received and held by him and in his possession as a result of his said employment and in trust for the inmates of the Oklahoma State Penitentiary, said inmates or prisoners being the owners thereof the exact amount thereof being unknown; that the said A. D. Martin while so acting as aforesaid, and having in complete charge and entrusted with the control, disbursement, receipt, safekeeping and transfer of the said funds, property, assets and effects, the same being in his possession by virtue of his said employment and trust, did, then and there acting unlawfully, willfully, wrongfully, fraudulently and feloniously, convert and appropriate to his own use and benefit, and to the use and benefit not in the lawful execution of the aforesaid trust of him, the said A. D. Martin, a portion of the said funds in the amount of and to the value of $3,825.43, in United States currency, a more particular description of which is unknown, and which was owned by and belonged to the prisoners of the Oklahoma State Penitentiary, * * *."

The defendant for reversal argues his case under eleven specifications of error, which, after Proposition One, for brevity will be taken up in combination.

Counsel argue that: "The indictment herein does not state facts sufficient to charge a public offense under the laws of the State of Oklahoma." It is urged that "when one is alleged to have embezzled property, it is necessary to plead and prove who the owner of the property is", and that to say that the funds belonged to

the prisoners of the Oklahoma State Penitentiary is not enough, because it is "a changing, revolving group," and is not "such an entity, capable of being ascertained and identified, so that a subsequent prosecution could not be maintained for the misappropriation or embezzlement of the same funds under the allegation that they belonged to some other or different individual or group."

Counsel says:

"The funds and assets should have been given legal status by having been provided for as State revolving funds, or in some other manner as to make their custody and safekeeping the responsibility of some public employee or officer, and not been permitted to blow around with the breeze—now in the custody of this person, now of that—so that no one knew or could know, what, when or where the funds were or should have been * * *."

While the criticism by counsel of the absence of special legislation covering the canteen system in the State Penitentiary without doubt is appealing and merits thoughtful consideration by the executive branch of our state government, and by the Legislature, as will be more apparent from the matters hereinafter mentioned, yet the fact remains that we do have a general statute covering embezzlement, §§ 1454 and 1451, supra, and while we do not find where this court has ever had occasion to construe the involved statute as applicable to a factual situation as here, the language of the statute does not appear ambiguous, and our consideration will be limited to ascertaining whether the indictment quoted includes allegations of those facts which the Legislature has declared essential to constitute the offense which it purports to charge. It is not for the court to require either allegations or proof of that which the Legislature has omitted in its definition of the crime.

We believe that the statute under which this prosecution was instituted, and heretofore quoted, should be interpreted in light of Tit. 22 O.S.A. §§ 406 and 410, and reading, respectively:

"406. When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, is not material. * * *

"410. No indictment or information is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

Counsel for defendant not only demurred to the information for the reasons heretofore recited, but demurred to the evidence of the state for the same and other reasons, so that at this point it might be helpful to consider the evidence as to the ownership of the canteen fund.

It appears that the canteen system was established at the Penitentiary in 1924 by a progressive warden, and through voluntary contributions. The beginning was an humble one, with a more or less limited purpose; one canteen was established to enable prisoners to secure cold drinks, candy, cigarettes, permitted toilet articles, reading literature, etc. The profits derived became a part of the canteen fund, later developing into a prisoner welfare fund, available for increasing the operation of the canteen, purchasing athletic equipment, a moving picture machine and like equipment to be used for the entertainment of the prisoners. But as stated by the county attorney in his opening statement, "like Topsy, it grew, and spread out like an octopus, over all the network of the peni-

tentiary," seven different canteens emerging with gross sales of several hundred thousand dollars per year, and with a nice profit. After such growth, the record indicates the fund was also used to pay or help pay for the burial of indigent prisoners and perhaps immediate members of their families.

Among the canteens was eventually established what was termed the Arts and Crafts Center, where prisoners manufacturing leather goods in their spare time could dispose of same, and the Arts and Crafts Center later selling the merchandise to outside purchasers, the profits thereby derived being placed in the canteen fund for the benefit of the inmates of the institution.

From the facts recited, it is thus apparent that the canteen fund constitutes a trust of which the prisoners in the penitentiary are the sole beneficiaries and real parties in interest. No one else could be said to have any title or ownership whatever and we conclude that the indictment properly charged the ownership as in the prisoners. By the wording of this indictment, appellant had sufficient notice and must have had knowledge of the acts of embezzlement for which he was to be tried thereunder. The gist of the charge is the allegation of the fiduciary capacity of the defendant and of the fraudulent appropriation of the property. The particular statute under which this charge was filed does not itself specifically require that there shall be any allegation of ownership of the property. This statute should not be confused with other special statutes covering embezzlement. By the statute here involved any person to whom money or property has been entrusted or who has control of such money or property for "the use of any other person, or for any public or benevolent purpose", and

who fraudulently appropriates such property, is guilty of embezzlement.

We are unable to vizualize how, under the allegations of the indictment, the defendant could be prosecuted by some other or different individual or group for misappropriation or embezzlement of the same funds involved in the within indictment, as argued by counsel for defendant, and no hypothetical situation within the framework of this case is suggested.

We conclude that under section 1454 of Title 21 O. S. A. an averment that the injured party was a firm, corporation, or association, or entity of any kind, capable of owning the property said to have been embezzled, was not necessary to enable defendant to prepare his defense, and said omission could not, in any manner, prejudice the substantial rights of the defendant upon the merits of the case, and the defendant is secured against a later prosecution on the charge, whether acquittal or conviction results. Mere refinement of pleadings should not be invoked as a subterfuge for the escape of violators of the criminal law. The indictment in question employs the use of language which makes clear and unambiguous the offense with which the defendant is charged, and it is such as to enable him to fully comprehend the charges and to make full defense to every allegation of the indictment, and we deem it sufficient.

We have examined the cases cited by counsel for defendant and the state, and find that there are two lines of authority as to the question of the necessity of alleging and proving in prosecution for embezzlement that "owner" of property, if not a natural person, was incorporated or otherwise a legal entity capable of owning property. However, an examination of the various

cases from the various jurisdictions discloses a variety of statutes covering embezzlement, general and special statutes, etc., and we have not found a statute worded just as ours, but the reasoning in many of the cases has been helpful.

The principle here under consideration has been by this court treated in a number of cases involving statutes other than those covering embezzlement. In the case of Zeligson v. State, 43 Okla. Cr. 24, 276 P. 791, being a case where the defendant was prosecuted for larceny under section 2063, C.S. 1921, Tit. 21 O.S.A. § 1435, and where the defense contended that the information was defective for not alleging whether or not "the Magnolia Petroleum Company" was a corporation, partnership or an association, this court held:

"An information for grand larceny charging that the defendant stole 50 joints of oil-well casings, 'the personal property of the Magnolia Petroleum Company,' held, a sufficient allegation of ownership of such property in such a prosecution under the criminal procedure of this state."

And see: Ireton v. State, 29 Okla. Cr. 266, 233 P. 771; and Gunter v. State, 16 Okla. Cr. 476, 184 P. 797.

The principle also finds support in the following cases from other jurisdictions: Shirley v. State, 206 Ala. 167, 90 So. 75; Davis v. State, 196 Ind. 213, 147 N. E. 766; Schuble v. State, 226 Ind. 299, 79 N.E. 2d 647; People v. Kirwin, 87 Cal. App. 783, 262 P. 803; State v. Smith, 140 Me. 255, 37 A. 2d 246; State v. Hume, 1950, Me. 70 A. 2d 543; State v. Littlefield, 122 Me. 162, 119 A. 113; Gibson v. State, 13 Ga. App. 67, 78 S.E. 829; People v. Mead, 125 App. Div. 7, 109 N.Y.S. 163, 22 N.Y. Crim. Rep. 225, affirmed in 200 N.Y. 15, 92 N.E. 1051, 120 Am. St. Rep. 616, 25 N.Y. Crim. Rep. 179.

Counsel contend that the court erred in denying defendant's motion for a bill of particulars. It is true, as pointed out by counsel, such motion is provided for in Federal Rules, but counsel does not contend that there is any state statute or rule of this court making such provision, and the reasons already given for finding the indictment sufficient as against the demurrer interposed, is sufficient to support the overruling of the motion complained of.

It is next argued that the court erred in overruling defendant's motion for a continuance on account of the absence of one Jan Stanley, and by reason of the refusal of the court to permit counsel to introduce certain evidence relative to acts and practices followed by Jan Stanley who preceded defendant as manager of the canteen system at the penitentiary.

In defendant's affidavit in support of his motion for a continuance, it was stated that on or about March 5, 1948, which was about four weeks prior to the trial, Mrs. Jan Stanley had informed defendant that when she was manager of the canteen it had been the custom to cash checks at the bank at McAlester, rather than deposit the same with the chief clerk-cashier of the penitentiary, (who handled all state funds in connection with the penitentiary) in order to conceal the identity of the customers from "certain parties", and to thereafter deposit the cash so received with the chief clerk-cashier. Defendant sets out that on March 22, 1948, he caused a subpoena to be issued for Mrs. Stanley for service in Oklahoma county, but alleges that he was later advised by the sheriff of Oklahoma county that Mrs. Stanley had left the state, following this he learned that she would be absent for several weeks.

We will call attention to the Stanley matter later on in considering the vital issue in this case, and being Proposition 7, involving the sufficiency of the evidence to make out a case. Suffice here to say, the defendant testified without objection on the part of the state that he had been told by prisoners who worked in the canteen and shortly after taking charge, that it had been the custom to cash checks at banks in town and turn the money in to the chief clerk-cashier in lieu of the checks. Defendant did not claim that he ever discussed the matter with Mrs. Stanley until nearly two and one-half years after the time of the alleged embezzlement, and did not claim to have been advised of such custom by any official of the penitentiary, and he did not claim that the warden ever approved or even had any knowledge of such custom and his adoption thereof. He accepted the word of a prisoner-clerk.

It has long been the rule of this court that the granting of continuance is largely in the discretion of the trial court, and the overruling of an application for a continuance will not constitute reversible error unless there has been such an abuse of discretion as results in a denial of a substantial right. See: Frazier v. State, 81 Okla. Cr. 120, 161 P. 2d 84; Scott v. State, 72 Okla. Cr. 305, 115 P. 2d 763; Lane v. State, 65 Okla. Cr. 192, 84 P. 2d 807; Andrews v. State, 84 Okla. Cr. 104, 179 P. 2d 491; Petty v. State, 11 Okla. Cr. 438, 147 P. 782; and see Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., N.S., 153, where it is said:

"Although an application for a continuance may appear to be good upon its face, yet if upon the trial the record discloses the facts that the testimony asked for would be cumulative, or that such testimony would probably not influence the action of the jury in finding a verdict, a conviction will not be reversed upon appeal."

In Sledge v. State, 40 Okla. Cr. 421, 269 P. 385, this court said, in paragraphs 4 and 5 of the syllabus:

"4. Motion for a continuance, based on the absence of a witness who has not been served with process, and who has left the jurisdiction of the court, should be overruled.

"5. Affidavit for continuance should state that witness is not absent by the procurement or consent of the defendant."

The affidavit in this case did not give the address of the witness outside of this state, or set out the probability of securing her testimony at any future time. We do not find that the court abused its discretion in overruling the motion for continuance.

The defendant sought to show by cross-examination of Don King, assistant cashier of the National Bank of McAlester, that prior to the time when defendant became manager of the canteen two checks payable to Arts and Crafts and bearing the endorsement of Jan Stanley had been cashed at the bank, one on May 18, and one on May 19, 1945. This was for the purpose of showing what the custom of defendant's predecessor had been. But, as before stated, defendant did not claim to have known of this custom from Jan Stanley until after the indictment. The court excluded this testimony. The material issue was not so much as to whether the defendant or anyone else had ever personally cashed checks that were made payable to the Canteen Fund or Arts and Crafts at one of the banks in McAlester, but rather as to whether or not the money so obtained was in each instance and in due course deposited with the chief clerk-cashier of the penitentiary. As stated, these matters will be further treated hereinafter.

The solution of defendant's Proposition 7 involved several other questions raised, and we deem that they may be resolved in the disposition of this issue. Defendant argues:

"The Court erred in overruling defendant's demurrer to the plaintiff's evidence and his motion for an instructed verdict in his favor, and particularly erred in this regard for the reason that the plaintiff's evidence failed to show that there had been any offense by this defendant for two reasons:"

"First, there is no proof in this record that anyone embezzled a single dollar from this so-called 'Canteen Fund.'

"Second; there is no evidence that this defendant ever at any time embezzled one dollar of these funds, but to the contrary, the record itself shows that at the time defendant is alleged to have embezzled these funds, all proceeds of checks cashed, and even more, were deposited in cash in the proper depository."

The state's evidence developed that the defendant came to the Oklahoma State Penitentiary, which will hereinafter be referred to as O.S.P., about June 1, 1945, as secretary to Warden Conner. He served strictly as such for about three months, opening all mail, receiving all funds transmitted for payment of employees and payment of goods manufactured for the state by the prison industries, etc. Later he was given the added duties of being in charge of the canteen funds, and canteen system that had been established for the convenience of the prisoners and by funds belonging to the inmates. There were three canteens inside the walls of the prison, one at the trusty building, one at the subprison, one at the women's ward, and one at Arts and Crafts outside. The defendant had one citizen, a nonprisoner, to assist him in his office, and one who was in charge of

Arts and Crafts, but a trusty was the clerk-cashier of the canteen system, receiving the cash and making out a daily report.

On entering the penitentiary the funds of the prisoners are deposited with the chief clerk-cashier, O.S.P.; and thereafter the clerk accepts orders from the prisoner on his account, much like a regular banking institution. Prisoners could purchase coupon books, and such coupons would be exchanged at the canteens for merchandise, and while the canteens handled no cash from prisoners, sales for cash were made to penitentiary employees and other outsiders. In fact, the evidence discloses that the Arts and Crafts Canteen made large sales to customers all over the United States, principally of articles of leather made by prisoners and disposed of through the canteen. There were certain prisoners who were permitted to purchase leather goods from other prisoners, in addition to any articles made by themselves, and dispose of the same to customers on the outside, and in competition to Arts and Crafts, which was, as stated, established for the benefit of all the prisoners. The evidence developed that one such prisoner when he left the penitentiary had amassed a small fortune from such activities, his comparatively short sojourn for murder being quite profitable financially.

The former warden, R. B. Conner, testified that the first information he had of a shortage in the canteen account was in 1945, when a shortage was discovered in the accounts of one Marion Larner, who was a prisoner, and who acted as clerk-cashier for the canteen system; that is, receiving all cash and coupons from the canteens, transmitting it to the chief clerk-cashier of the O.S.P. in the same building and on the same floor. Larner was short $7,900. He served as clerk from April 1, 1944, to

May 31, 1946. At this time the warden talked matters over with the defendant, and an auditor, Ted Masco, from the State Board of Affairs, who charged off the shortage and balanced the books. Witness stated that the latter part of 1946, or first part of 1947, he heard rumors of a further and larger shortage and called defendant in. Witness was asked:

"Q. What report did he [defendant] make to you? A. He said there wasn't nothing to it. Q. Said no such shortage existed? A. That's right." .

The warden further testified on cross-examination that at the time the defendant took over management of the canteens he did not know whether an audit was made or not; that he knew one was not made at the time he became warden. Witness admitted that the defendant had talked to him about the prisoner-help handling the coupons that prisoners exchanged for merchandise, and the difficulty of determining whether or not all coupons were turned in and whether the correct amount was always collected for goods sold, etc. At first Mr. Martin's office was just inside the first door of the prison, but later was in the same room with the chief clerk-cashier of O.S.P., whose cage was some 15 or 20 steps distant.

John W. Prigmore, certified municipal accountant, whose firm had been employed to make an audit of the canteen accounts, after the shortage rumor persisted, testified to auditing the account prior to and to cover the period June 1, 1945, to April 3, 1947, the period of defendant's incumbency. He testified to checking in the manager's office, duplicates of all sales tickets that were available, for the period, together with the daily reports. He testified to records being incomplete and of making further investigations at banks and express offices outside the penitentiary. He testified that he found rec-

ords of receipt of cash in excess of the amount deposited with the cashier throughout the period, and amounting to $32,208.68, and that in the month of May, 1946, there was an increase of undeposited funds in the amount of $3,825.43, and being the amount defendant was charged in the information with embezzling. Witness further testified with reference to defendant's tenure of office:

"The undeposited funds on hand at the beginning of the period, was $3744.42; in all but five months during that period the undeposited funds increased."

He further testified that during the defendant's tenure, he found that the authorities had discovered four shortages in amounts of $7,970.50, $2,441.56, $695.50, and $1,189.50, or a total of $12,297.06 which had summarily been written off by state auditors, and with no apparent corrective measures taken, which would leave a cash shortage unaccounted for above the four items, of $19,-911.62. The item of $3,774.42 above mentioned was supposed to be in the cash box and on hand when defendant assumed his duties. Whether the prisoner-clerk, Marion Larner, actually had said sum at said time is not shown.

The record discloses that during the period in question checks made payable to the Arts and Crafts Center, being the canteen fund, thirty-six in number and totalling $17,723.50, and all except one bearing endorsement "Arts and Crafts Center, A. D. Martin" had been cashed at a local bank, and without having been identified as being deposited in a regular manner with other collections with the chief clerk-cashier of the O.S.P.

The evidence developed that the records of the penitentiary did not disclose the system of cashing checks out of the regular channels, but that the same was dis-

covered by independent investigation of the auditor outside the penitenitary.

Chas. G. Morris, State Examiner and Inspector, testified that he assigned A. R. Barber and Les Niblick to make an audit independent of the private auditor Prigmore, and witness Barber testified as to the receipt of cash in excess of the amount deposited with the chief clerk-cashier of O.S.P., during the period of incumbency by defendant, substantially as was testified to by auditor Prigmore. Counsel for defendant brought out on cross-examination of witness the fact that under the rules no employee of the canteens was to accept coupons except that he tore the same out of the coupon book himself, but that the practice was not strictly followed, and that witness had heard that coupons were used as a medium of exchange by prisoners in crap games. Coupon books were accumulated by a prisoner and turned in for cash credit. The state did not object to this line of cross-examination.

Don King, assistant cashier of the National Bank of McAlester, testified on behalf of the state, identifying some 35 checks cashed at his bank and bearing the endorsement of the defendant, and testified to cashing checks for defendant many times, and personally handing defendant the money. He testified that the bank did not have an account entitled "Arts and Crafts Center"; that all deposits from the Penitentiary were made in the name "Oklahoma State Penitentiary, by Walter Haggard."

Of significance was the testimony of Ivan Rowe. He testified that he was an accountant and worked with John Prigmore in making an audit of the canteen account, and he testified to the facts of the shortage and in the amounts as already recited. His evidence indicated that on the date of the cashing of the checks at the McAlester

bank or within two or three days thereafter, funds sufficient to cover all checks so cashed were deposited with the chief clerk-cashier of O.S.P., but that there was no record to disclose whether the proceeds of the cashed checks made up or helped make up such deposit or whether other cash sales made up such deposit. There was, however, an overall progressive shortage. The records of the prisoner-clerk for the canteen fund, Marion Larner, failed to show any record of the checks cashed at the McAlester bank; there was no record of where he had ever receipted the defendant for the cash from such checks, and his receipts from the chief clerk-cashier of the O.S.P. did not, of course, identify the source of the cash deposited with him. The evidence indicated a total lack of checks and balances or system, but definitely disclosed a business that had far outgrown the abilities of the persons supposedly administering it, and the failure of the findings of the state auditors to bring about any action until the final and larger shortage here involved.

The question now is, Was the evidence adduced by the state sufficient to withstand defendant's demurrer?

It must be conceded that at the close of the state's case the evidence against the defendant was weak. That is to say, there was no overwhelming evidence of guilt. While the evidence showed an overall shortage in the canteen funds, the prisoners helped handle the funds at the canteens, and the defendant had inherited a prisoner for his canteen cashier, and the evidence was conclusive that the prisoner-help did not always follow the instructions in handling coupons, and that the loose and inadequate system of handling canteen funds was in effect when defendant assumed his duties as manager of the canteen system. Also, two prisoner-clerks who acted as cashiers for the canteens, had been checked short; Larner was

deceased and Lake was a fugitive. However, the evidence of the state did develop that the defendant had diverted checks remitted to the Arts and Crafts Center, from deposit with the chief clerk-cashier of the O.S.P., and to have obtained the cash on many of them personally, and particularly on or about May 31, 1946, in amount of $3,825.43. The evidence further showed that defendant opened all mail for the Arts and Crafts and received all checks and funds forwarded through the mails, and had complete charge of the trust funds for the period June 1, 1945, to April 3, 1947; that he had instituted no change in a system that, to any person with the ability to handle the job, must have appeared inadequate; that during this period there was a net shortage in cash turned in to the O.S.P. chief clerk-cashier of $19,911.62 in addition to a total of $12,297.06 charged off by the Board of Affairs auditor during his tenure. The evidence further disclosed that when Warden Conner heard a rumor that there was a new and larger shortage in the canteen fund, above the previous charge-offs, and had called defendant in and questioned him, that he advised the warden that there was no foundation to the rumors, though soon thereafter an audit revealed a new shortage of $19,911.-62 in addition to the previous charge-offs of $12,297.06. The evidence further showed that the warden had no knowledge of the defendant cashing checks out of the regular institutional channels and obtaining the cash personally, though being defendant's immediate superior it can be assumed that all such irregular, if not surreptitious actions, should have had the warden's approval. Also, the auditors failed to find any records in the office of the prisoner-clerk's office to show the receipt from defendant of the cash received by him as a result of cashing checks out of the regular channels. In fact, the unusual scheme of cashing checks was not voluntarily disclosed

to the auditors, but they discovered the system by independent investigation outside the penitentiary. And while the evidence disclosed that there was always deposited with the chief clerk-cashier of O.S.P. either on the day or a day or so after the outside cashing of checks bearing defendant's endorsement, sums in excess of the amount of checks so cashed outside of regular channels, nevertheless the record failed to show whether the deposits so made included the proceeds of the checks .so cashed outside or were made up of cash sales from the canteens.

The above were important circumstances to support the allegations of the indictment, and unrefuted or unexplained, were sufficient in view of the fiduciary relationship of defendant under 21 O.S.A. §§ 1454 and 1451, to make out a prima facie case of embezzlement, and we conclude that the action of the court in overruling defendant's demurrer to the evidence of the state was not error. This court has uniformly held that where there is any competent evidence, reasonably tending to sustain the allegations of. the indictment, the court should not sustain a demurrer to the evidence. Smith v. State, 44 Okla. Cr. 254, 280 P. 317.

We now consider the direct evidence for the defendant.

The defendant testified that he was 67 years of age in July, 1948; that he had been a bookkeeper-auditor since 1904; that he assumed the duties as the warden's secretary, O.S.P., on March 1, 1945; that he opened all the mail addressed to the warden, handled all remittances to prisoners, and handled all funds which were taken in from the sale of brick and tile and everything manufactured and sold out there so far as the prison industries operated by the state were concerned, and amounting to over a million dollars during an 18-months period. He

further testified that on or about June 1, 1945, after three months as secretary, he was given the additional duty of having complete charge of seven prison canteens and with 25 or 30 prisoners to help; that he had as bookkeeper for the canteen funds one Marion Larner. Witness further testified:

"Q. What were his duties? A. He was a trusty, his duties were to keep books on the canteen, receive the cash that came up every morning, receive the coupons when they were brought up and deposited with the chief clerk, keep the books, and make a monthly report. Q. Did he have a cash box? A. Yes, sir. Q. What sort of box was it? A. Drawer in a flat top desk with a Corbin lock on it. Q. That was a hasp lock? A. No, regular desk lock, Corbin lock—pretty good lock there. That was what was on the desk. Q. Did he have a key to that cash box? A. Yes, sir. Q. Did you at that time have a key to that cash box? A. No, sir. Q. Did you ever have a key to that cash box? A. No, sir. Q. Well there was one time, I think, when somebody was sick— A. There was two times when Leland Lake run off,—the office—I was out of town. I came in Sunday night—the door-key handed me the keys when I checked in Sunday night, and said 'Leland said give you these keys,' and I said 'where is Leland?' and he said 'That's what we would like to know.' Q. How long did you keep the keys? Q. Until 8 o'clock the next morning. Q. What did you do with them? A. Gave them to Walter Haggard [who was Chief Clerk-Cashier of the O.S.P.] and said to 'take these keys and open the drawer and count that cash and check it with the drawer, and see where it is,' and he did. Q. Leland Lake succeeded Marion Larner as bookkeeper? A. Yes, sir. Q. At the time Marion Larner left what happened? A. When he got sick? Q. Got sick, did he turn the keys over to you? A. No, sir. Q. How did you get them? A. I didn't get it. I was called into the Warden's office the next morning and he told me we was $8,000 short. Q. The Warden did? A. The Warden did. I said, 'how do you know?' and he said 'I had Leland

check it.' How Leland Lake got that key I don't know unless he got it from the man sent to the hospital with Larner. Q. You didn't, on these occasions, have a key to the cash box? A. Never did, no."

Witness claimed that he protested to the warden about the method of handling the cash through prison help, but to no avail. He further testified:

"Q. Referring to the exhibits that have been offered by the state, and numbering, I believe, from one to 36, I will ask you to look those over and see if you ever saw the originals of those checks and drafts? A. I saw them insofar as endorsement was concerned, yes. Q. Tell the court and jury under what circumstances you happened to endorse those checks or drafts or put the Arts and Crafts stamp on them? A. I didn't put the Arts and Crafts stamp on them. They were put on there by the bookkeeper, but to begin with—sales came up this morning for yesterday. There were checks that had to be deposited, had to be endorsed, no matter where they went. Q. Or who they were on? A. Yes. They were made to Arts and Crafts. Nominally, I was manager. It was my duty to endorse the checks. He would bring the checks in and lay them down on the desk and said: 'Here are the checks that have to be endorsed—' Q. Who? A. Marion Larner. Of course, I was busy, I would stop what I was doing—he had the stamp on them, ready for my signature, and I would sign them as fast as I could. *I don't know whether he deposited them with Walter Haggard* [the penitentiary cashier] *or sent them to be cashed, or what.* I was over in the other office. (Italics ours.) Q. With reference to those which were cashed at the bank here, what conversation or what statement was made to you as to the necessity of cashing those checks and how did it happen that they were cashed? A. When I took charge of the Arts and Crafts and the canteens, I guess the next morning, or the next morning, the bookkeeper, Marion Larner, came in with some checks, and said 'here's the checks you have got to endorse them' said, 'some of these checks we ought to send them down

and cash at the bank and bring the money back and put it in the drawer and deposit the cash.' I said 'For what reason?' He said: 'Those inmates working in the chief clerk's office'—I referred to a while ago—'gets the names and addresses of the customer off the check and have been getting quite a lot of our business.' Said, 'We have been doing that quite a little—I think it best to do that because they will quote them prices a little cheaper than we would because we bought them from them and sold them for a profit.' I endorsed them all and he took them. What he deposited with Walter Haggard out of that bunch I don't know. Sometimes he would bring in envelopes with some checks in them and lay them down on my desk and say, 'I want to cash them.' He would have the amount, $240.00, $500.00, or $1,000.00, or whatever amount, on the outside of the envelope. I didn't go very often, but sometimes I go down and would cash them; and I would give them to the auditor, or he would, in the same envelope, and if he went he would bring it back and lay it down and I took it in. Q. On the occasion you got the cash on these checks, what did you do with it? A. Gave it to the bookkeeper-cashier. I had to—didn't have any key to the drawer to put it in, and never did have."

There were a number of Railway Express checks issued for c. o. d. orders shown to have not gone through the penitentiary cashier for collection, and totalling $2,-040, and they did not have the name of the sender on them anywhere, yet they were shown to have been endorsed by defendant and cashed directly at a bank in McAlester. Witness claimed that there was a slip attached to each Railway Express check giving the name and address of the person sending it. But if such slips existed, they were removed before cashing. He had a specimen slip that was marked Exhibit 2, but never introduced into evidence, but which was included in the case-made. It was merely an Express Company form used by shipper in making shipments by express, and not a

form as part of express checks used by the express company in remitting on c. o. d. orders.

On cross-examination defendant stated that all the checks required his endorsement; that he would get the checks and turn them over to his prisoner-helper, who would have him endorse them and would handle the checks, picking out the ones not to be run through the office of the prison-cashier, Walter Haggard, and that either defendant or Mr. Sheppard (the auditor) would get them cashed and turned the money to the prisoner-clerk, Larner. Defendant insisted that Mr. Sheppard did not bring the money back to him, but to the prisoner-clerk.

Defendant denied keeping a single dollar of the proceeds of the checks cashed by him, or keeping a single dollar from any source belonging to the canteen system. He further testified that when he assumed his duties he had $900 to $1,000 in cash in an Oklahoma City bank and he showed from his statements that he had saved $2,744 out of a salary totalling $5,000 while at the penitentiary. And he testified that he did not turn the cash proceeds in direct to the chief clerk-cashier of the O.S.P., because it was necessary for the clerk of the canteen to keep a record, and he was the one to turn the proceeds in direct to the O.S.P. office and obtain a receipt. He did not know whether or not the prison kept a record so the cash could be traced.

Ted Masco, auditor for the State Board of Affairs, testified for the defendant that Marion Larner, the prisoner-clerk, was in charge of the canteen cash box from April, 1945, to April, 1946; that he was called to audit Larner's accounts and ran receipts of cash received against the cash he should have on hand and found him $7,900 short. Witness stated that Larner had gone to the hos-

pital was the reason they found him short. He stated that Larner had advanced coupon books to certain prisoners in amounts as high as $600 when they had no money on deposit to pay for them. He testified that Leland Lake succeeded Larner, and then he skipped out, left the keys in the door and was $2,400 short in the cash account, and he did not know how many coupons. He testified on cross-examination that he did not make a real audit, but charged off the losses to balance the books.

W. L. McGowan, from the State Examiner and Inspector's office, testified for defendant. He stated that he had never checked the canteen account, that Ted Masco consulted him with reference to making some adjustments to make the books balance; he stated that he personally knew that Marion Larner had carried the keys to the cash box and had never seen defendant with a key.

J. Virgil Choate testified that he was record clerk at the penitentiary. The substance of his testimony was that one Claud Hopkins, (the prisoner who formed the excuse for getting cash on checks out of the regular channel) worked in the auditor's office June 6, 1945 to August 1, 1946.

Melvin A. Wilkins, C. P. A., testified for the defendant. He stated that the audit was not complete and due to the state of the records and absence of records, it would be impossible to make a complete audit. He was asked by Mr. Dierker on direct examination:

"Q. From your analysis, Mr. Wilkins, can you say whether or not in connection with these checks the same day they were or any of them were cashed or whether or not a day or two thereafter, more than that amount of checks were deposited to the account? A. Yes, more was deposited either on that day or a day or so afterwards, the deposits exceeded the amount of the checks

cashed. Q. There wasn't anywhere there was not more money deposited within a day or two than the amount of checks? A. Yes, that is right."

On cross-examination witness admitted that he did not know where the funds came from represented in the different deposits testified to and had no way of knowing, but that he would take it for granted that they resulted from the checks cashed, but he could not say. Witness was further asked, on cross-examination:

"Q. If the cash book showed that at all times they were carrying large cash balance there in the cash box, you couldn't possibly tell whether they took that money out of the cash box? A. When that money is intermingled, if loses its identity right there. Q. And you wouldn't know, going three or four days elapse between cashing of checks and making that deposit, you wouldn't know what other collections came in in that time? A. No, sir. Q. You have no way of knowing? A. Correct."

Walter Haggard, chief clerk of O.S.P., testified for the defendant. The gist of his testimony on direct examination was that the prisoner-clerks Marvin Larner and Leland Lake had deposited with him many thousands of dollars in checks and cash, for which he issued a receipt. His testimony as a whole was to the effect that he was unable to tell where the cash came from; that he had understood that sometimes checks payable to the canteen were cashed in town, but he had no way of knowing whether same was included in the cash deposited with him. He stated on cross-examination that all checks deposited with him were by him endorsed and deposited by him personally in his depository account. He was handed State's Exhibit 37, consisting of eleven sheets of photostat copies of 42 checks covering a period 1945-1946, shown to have been made payable to Arts and Crafts Center, executed by A. A. Vassaur and given on American Ex-

change Bank of Henryetta, Oklahoma, all bore the endorsement of Walter Haggard and passed through the regular depository account.

He further testified on re-direct examination that Claud Hopkins, who had worked for him, was in the leather business; that he purchased finished purses and leather articles from other prisoners and sold them to the public.

F. A. Sheppard, auditor at O.S.P. since November 4, 1945, testified for the defendant. He was asked on direct examination:

"Q. * * * Now, Mr. Sheppard, I will ask you if at various times you didn't go down and cash those checks for Mr. Martin and bring them back and give the money to the bookkeeper there? A. No, I gave it to Mr. Martin."

He further testified:

"A. I gave it to Mr. Martin and he turned the cash over to the bookkeeper. Q. Did you see him give the money to the bookkeeper after you had given it to him? A. On one occasion, yes, sir."

He further stated that one time Mr. Martin failed to endorse a check, but he was able to get it cashed with the Arts and Crafts stamp on it, and without such endorsement.

On cross-examination he stated that all the checks he got cashed at the bank in McAlester were personally given him by defendant and he returned the cash to him in envelopes. He did this more than a half dozen times. He further stated that any identification slips attached to the Railway Express Agency checks had been removed; that he never saw any slips, and that he did not open the mail, and had no knowledge about the removal, if removed.

The state in making out its case introduced among other checks bearing the endorsement of the defendant and cashed at the National Bank of McAlester, a check dated September 25, 1945, executed by A. A. Vassaur on the American Exchange Bank of Henryetta, Oklahoma, in the amount of $35 and one dated February 14, 1946, from the same customer and on the same bank for $2,225. Counsel in opening statement, and the defendant when he testified, gave as the reason for cashing such checks out of the regular order, that it was to prevent a prisoner-helper who worked in the office of Walter Haggard, O.S.P. Chief Clerk-Cashier, and who was in the leather business himself and in competition with Arts and Crafts, from obtaining the names of the Arts and Crafts customers and underselling. Nevertheless, on cross-examination of Walter Haggard, a witness for defendant, the state identified and introduced 42 additional checks from the same A. A. Vassaur totalling $32,-579.84 that apparently were handled, or at least a portion were handled, through Haggard's office in the regular channels, so that the prisoner leather goods competitor had every chance to discover the name of this very good customer and the reason assigned for cashing the two checks of this customer out of the regular channels was exploded.

Also, the state had Don King, cashier of the National Bank of McAlester, identify a number of Railway Express Agency checks that bore defendant's endorsement and on which he or auditor Sheppard were given the cash, and there was nothing on these checks whereby any person could secure the name or address of the customer, as has been pointed out, so the reason assigned for cashing the Railway Express Agency checks out of the regular channels was likewise exploded.

We are impelled from the evidence and circumstances to agree with the contention urged by the Attorney General, that:

"It was for the jury to determine from the evidence whether the month-to-month shortage was due to the embezzlement of funds received from other sales and sources or from failure of defendant to account for the funds which were conclusively shown to have been in his hands as a result of his cashing of checks."

As this court has so often held, the Criminal Court of Appeals will not reverse judgment of conviction on ground that the verdict is not supported by the evidence, unless there is no substantial evidence tending to show guilt or evidence fails so far to support verdict that necessary inference is that jury must have acted from partiality, passion, or prejudice. Lewis v. State, 81 Okla. Cr. 168, 162 P. 2d 201; Keith v. State, 87 Okla. Cr. 310, 197 P. 2d 635; Bush v. State, 91 Okla. Cr. 310, 218 P. 2d 386.

Defendant was permitted to recall state's witness Don King, assistant cashier of the National Bank of McAlester and sought to show by him by cross-examination that prior to May 1, 1945, and prior to the employment of defendant at the State Penitentiary, his predecessor had cashed checks at said Bank and out of the regular channels and had obtained the cash. Witness testified that he had found records on the record machine of two checks endorsed by one Jan Stanley, defendant's predecessor; one dated May 18, 1945, in amount of $88, and another of same date in the amount of $325.50. The court sustained the objections of the state to the introduction of this evidence on the ground that it was incompetent, irrelevant and immaterial in that the checks covered a period not under consideration and that what any other

person or persons might have done was not material. We conclude that the trial court properly sustained the state's objection, and that the testimony of Jan Stanley (lack of whose testimony defendant had interposed as grounds for continuance) if she had testified to such practice, would have been incompetent for the reason that Jan Stanley had only been an employee just like the defendant. Obviously, the admitted practice of cashing checks out of the regular channel with no system of tracing the proceeds of such checks so cashed, and with the selection of such checks to be cashed entrusted solely to the judgment or whim of a prisoner-clerk, and with the cash returned to such clerk without obtaining a receipt from him, and all without the knowledge or approval of the warden of the penitentiary, was, to say the least, an irregular, if not furtive, procedure. And especially is this so when it is considered that the defendant had for over 40 years been an accountant, and well knew the importance of records and receipts and the standard and rational methods of handling trust funds. His effort to justify this by showing that his predecessor had followed the practice in at least two instances could have formed no justifiable basis for his practice in the first instance, because admittedly he did not know this until after he had gotten into trouble. It could not have influenced his actions at all. When defendant obtained cash from checks and out of the regular channel, he did so at his peril. The vital question was whether or not he deposited said sums of money so obtained to the canteen account in the State Penitentiary. This could have been explained if defendant had obtained receipts from the prisoner-clerk of all sums so turned over to him, or from receipts from Walter Haggard, the O.S.P. cashier. But no such receipts were offered. If he had kept or the prisoner-cashier had kept, a rec-

ord of all such checks so that the proceeds could have been traced as being included in the cash deposits shown to have been by the prisoner-clerk paid in to the O.S.P. cashier, such evidence would have been most important, and no doubt would have satisfactorily accounted for said funds, even though irregularly handled. But defendant did not offer any evidence in corroboration of his statement that he turned in all funds obtained from cashing the checks in question, (the total amount of checks so cashed out of the regular channels and bearing his endorsement totalling $26,355.30), except the auditor testified that he turned in all the cash from the checks he had cashed for defendant to the defendant, and that he saw the defendant one time turn such funds over to the prisoner-clerk. Overall, the effort was to justify defendant's irregularities by the irregularities of someone else. We conclude that it was not error for the court to exclude the testimony of witness King as to the fact of said Jan Stanley prior to the time charged, having cashed two checks out of the regular channel, and that her testimony to this effect, had she been present, would have been incompetent, irrelevant and immaterial, and consequently it is our further conclusion, by reason of such fact, that the trial court did not commit error in refusing a continuance on account of the absence of Jan Stanley, who had not been served with summons.

Counsel complain that the court erred in his instructions to the jury, but attempt to point out defects only as to instruction No. 4, which instruction reads:

"Now, in this case, if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, A. D. Martin, did, in Pittsburg county, Oklahoma, on or about the 31st day of May, 1946, while duly employed by the State of Oklahoma at the Oklahoma State Penitentiary, was assigned by the Warden thereof to the duties

as secretary and as manager of one certain fund known as the Oklahoma State Canteen fund, and as such was charged and entrusted with the collection, receipt, safekeeping and disbursement of all money, merchandise, securities, assets, property or effects of any kind of said fund or belonging to said fund, which fund was owned by the inmates or prisoners of said penitentiary, and that by virtue of his said employment, occupied the position of trustee of said fund for safekeeping, transfer and disbursement; and as such trustee and while acting as such, and while charged and entrusted therewith, have and hold in his possession and control in trust for said inmates or prisoners, certain funds, property, assets and effects, the exact amount being unknown, and that while so acting and having complete charge and control thereof, did then and there unlawfully, willfully, wrongfully, fraudulently and feloniously convert and appropriate to his own use and benefit, and to a use and benefit not in the lawful execution of said trust, a portion of said funds in the amount of and to the value of $3,825.43, or any other sum in excess of $20.00 in the United States currency, a more particular description being unknown, and which was owned and belonged to the prisoners of said penitentiary, as alleged in the indictment, then and in that event you will find the defendant guilty of the crime charged, and so say by your verdict. But unless you so find beyond a reasonable doubt, it will be your duty to find the defendant not guilty."

Counsel argue that there was no positive evidence of any embezzlement on the part of defendant or anyone else, and say:

"Had the Court instructed the jury that they must find the specific amount to have been embezzled and not left the door open at any amount between $20.00 and $3,825.43, then we would have some way of pinning down the prosecution's evidence and getting some idea as to what we were convicted of, so that we could assemble our facts to answer such specific charge. * * *"

Paragraph 69 of Vol. 18, Am. Jur., setting out the general rule is cited, although the general rule is contrary to the position of defendant, it being stated in said citation:

"The greater weight of the decisions, however, seems to be to the effect that a specific finding of value is not essential to a valid and sufficient verdict."

See, also, 79 A.L.R. §§ 1180 and 1181, setting out a collection of adjudicated cases on the subject, wherein it is stated:

"In the larger number of cases in which the question has arisen, it has been held that a general verdict such as 'guilty', 'guilty as in the indictment', 'guilty of grand larceny', 'guilty in the second degree', etc., is sufficient, without a finding of the value of the stolen property, to support a conviction of larceny or embezzlement, since where, under proper instructions from the trial court, the jury has found such general verdict, it can, by reference to the indictment and instructions, be made certain as to what value the jury must have found. These cases base their results on such principle even though the degree of the crime or the place and form of punishment depend on the value of the property."

While no Oklahoma case is cited by either side, and we have not found any Oklahoma case exactly in point, this court has held that "Under an indictment for embezzlement, it is sufficient for the state to prove embezzlement of any part of the amount alleged," Fulkerson v. State, 17 Okla. Cr. 103, 189 P. 1092, and the instruction complained of did advise the jury that the sum embezzled must have been above $20, so that their finding that the defendant was "guilty of embezzlement, as charged in the indictment herein * * *" impliedly indicated an amount over the statutory sum of $20 necessary to support the amount of punishment assessed in accordance with the statutory provision. 21 O.S.A. § 1462.

There was a further instruction given by the court, being No. 6 that clarified the issues, and being:

"* * * You are instructed that evidence has been introduced in this case which might tend to show the commission of other offenses than the offense charged in the indictment herein. In this connection you are instructed that the court has permitted this evidence to go to you for one purpose only, i. e., to show a system, plan or scheme, if any. However, you are instructed that even though you should find and believe from the evidence, beyond a reasonable doubt, that the defendant is guilty of any offense other than the offense charged in the indictment herein, yet if you do not find and believe from the evidence, beyond a reasonable doubt, that the defendant is guilty of the crime charged herein, it will be your duty to find the defendant not guilty."

It is next contended "that the court erred in permitting the jury to separate after the cause had been submitted to them and they had deliberated on their verdict for some hours."

This contention is based on the facts, as shown by the record, that the cause was submitted to the jury around 2 p. m. on April 18th, and that about 6 p. m. the jury was called in and asked by the court as to the chances of a verdict, and was advised that the jurors were about equally divided, or, in their words: "About 50-50". The court then reminded the jurors that they had listened to evidence for two and a half days but had only considered the same for a little less than four hours, and it was his idea that they should consider the case further. He then asked the county attorney how he felt about it. The county attorney stated that due to the importance of the case that he would like for the jury to consider the case further. The court then asked one of defendant's counsel what he thought about it, and he answered:

"Your honor, I think that's entirely up to the court." The court then asked counsel: "Is there any objection to this jury separating?" The couny attorney answered: "None on the part of the State", and one of defendant's counsel answered: "We have no objections." The court then advised the jury that they could come back that night for further deliberations if they wanted to, but after some talk back and forth, he instructed the jury to return the next morning at 8:30.

Counsel now claims after the verdict of the jury was against his client, that he was embarrassed by the trial court asking him in the presence of the jury what he thought about the jurors separating; that they were tired out and apparently wanted to go home and for him to have objected might have prejudiced his client's case. The same argument might have been interposed on behalf of the state, as it was the county attorney who in the first place answered that he would like for the jury to consider the case further when ordinarily they might have been discharged from further consideration.

There is no doubt but that it is the better practice for the court in situations as in the within case, to call counsel to the bench and make all such inquiries out of the hearing of the jury, and then announce his ruling. Counsel for each side would also have opportunity to make their records out of the hearing of the jury. By such failure, counsel for defendant claims the action of the court constitutes reversible error and cites Yarbrough v. State, 13 Okla. Cr. 140, 162 P. 678, Horn v. State, 13 Okla. Cr. 354, 164 P. 683, and Nowabbi v. State, 31 Okla. Cr. 158, 237 P. 868, in support of his position. We have carefully read each of the cited cases, but do not find them in point.

It is true that after a case is submitted to the jury that they are supposed to be placed in charge of a bailiff or bailiffs and kept together, and there is no statutory provision giving the court any discretion in the matter after the case has been submitted, as is provided prior to submission, 22 O.S.A. § 853, yet this court has held that a defendant in a criminal case may waive any right not inalienable given him either by the statute or the Constitution, where it can be relinquished without affecting the rights of others. Hill v. State, 9 Okla. Cr. 629, 132 P. 950; Whitfield v. State, 45 Okla. Cr. 397, 283 P. 266. In the latter case this court held:

"Where, after the final submission of the case, the state and the defendant in open court consent that the jury may separate until the next day before beginning deliberation on their verdict, the defendant thereby waives his right to complain that the jury was not kept together during such period."

Herein we conclude that there was an effective waiver of the right of the defendant to have the jury remain together in charge of proper officers, by reason of counsel having unequivocally agreed by stating: "We have no objections."

Counsel contend "that the court erred in refusing to permit defendant to inquire of certain jurors as to the proceedings had in the jury room when said jurors were called as witnesses in support of defendant's motion for new trial."

On hearing of the motion for new trial, defendant caused one juror, J. R. Lindley, to be placed upon the stand. We have read his testimony carefully and while he admitted that during the overnight recess he had read the McAlester News-Capital, he did not state that he had read an item with reference to the case on which he was

then sitting, as contended by counsel in his brief. He was asked:

"Q. [By Mr. Jones] Did you read the piece in the News-Capital in reference to the case that you were trying? A. In reference to the case we was trying? A. Yes. A. No."

He was then asked if he had read a piece in said paper with reference to an embezzlement in another state institution, and being the Helena School, and he stated that he had. That was a front page story. The court refused to admit the newspaper in evidence, or to hear testimony along the same line from other jurors, and to permit them to be examined as to why they decided the case as they did, on the ground that it was an attempt to impeach the verdict of the juror by showing that he did not decide the case from the evidence given him from the stand and from the instructions given by the court. There was nothing in the record to show that counsel requested the court to specifically instruct the jurors to refrain from reading newspapers the night of the recess, but the court apparently did give the statutory admonitions to the jury, and counsel made no further suggestions to the court.

We conclude that the court did not err as it seems to be well established in this jurisdiction that in a criminal case a juror will not be permitted to impeach a verdict by affidavit or testimony by showing misconduct on his part in arriving at the verdict. For reasons for the rule, see Keith v. State, 7 Okla. Cr. 156, 122 P. 172. Also see Xoddy v. State, 47 Okla. Cr. 283, 287 P. 765; Nichols v. State, 47 Okla. Cr. 291, 287 P. 1106; Vanderburg v. State, 6 Okla. Cr. 485, 120 P. 301; Spencer v. State, 5 Okla. Cr. 7, 133 P. 224; and Harrell v. State, 85 Okla. Cr. 293, 187 P. 2d 676.

The above disposes of the issues raised, and by reason of what has been said, it is the opinion of this court that there is no substantial error.

The case is affirmed.

JONES, P. J., and BRETT, J., concur.