## BEN COLEMAN et al. v. STATE.

No. A-9659.   July 17, 1940.
Judgment Modified on Rehearing Sept. 18, 1940.
(104 P. 2d 1004; 105 P. 2d 431.)

Sid White, of Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Lewis R. Morris, Co. Atty., of Oklahoma City, for the State.

BAREFOOT, J.   Defendants, Ben Coleman and Verl Leathers, were charged in Oklahoma county with the crime of tapping a pipe line.   They waived a jury and were tried by the court; found guilty, and their punishment assessed at two years in the penitentiary, and they have appealed.

The information in this case charged four defendants, Jack Shaffer, Harrold E. Hicks, Verl Leathers and Ben Coleman, with the crime of tapping a pipe line on or about

the 1st day of August, 1937, in Oklahoma county. The defendants, Jack Shaffer and Harrold E. Hicks pleaded guilty to the charge and were both used as witnesses by the state against the defendants. They both testified that the defendant Jack Shaffer had a skimming plant on Crooked Oak creek.

Jack Shaffer testified that he and the other two defendants entered into an agreement where said defendants were to tap the pipe line of the Oklahoma Pipe Line Company a short distance above the skimming plant owned by the said Jack Shaffer. That in compliance with this agreement the pipe line was tapped by drilling holes in the same and the oil was permitted to flow down the creek where it was captured by the defendant Jack Shaffer. On one occasion 800 barrels of oil were captured and the defendants Ben Coleman and Verl Leathers were paid the sum of $80 each by the said Jack Shaffer. At other times various sums ranging up to $50 were paid to each of the defendants for oil that was taken from the pipe lines and captured by the said Jack Shaffer.

The witness Harrold E. Hicks, who pleaded guilty and was a witness for the state, was employed by the Oklahoma Pipe Line Company as a line walker. The evidence revealed that these defendants procured certain tools for the purpose of tapping the pipe line, and that it would be done in the nighttime, and at some places where the line was covered by the water in the creek. It also appeared in evidence that efforts were made by the defendants to so open the pipes at certain times that the fact that the line had been tapped would be concealed. Wooden stobs were driven into the pipes where the line had been tapped so that they could be easily removed at night. The evidence revealed that the oil was of the value of $1.30 per barrel at the point where it was taken from the pipe line,

and that it was worth, and sold for, 80 cents per barrel when recovered by the witness Jack Shaffer.

The evidence of the witnesses who were accomplices was amply corroborated by other evidence offered by the state. Wilkins v. State, 70 Okla. Cr. 1, 104 P. 2d 289.

The arrest of these defendants was by a member of the Oklahoma Highway Patrol, J. H. Roberts, who was assisted by T. P. Salley, who was a special agent of the Standard Oil Company, and who had been assigned by his company to assist in the clearing up of this crime when it was discovered by the company officials.

The witness Harrold E. Hicks was first arrested on the 13th day of September, 1938, and was placed in jail and remained there until the following Friday, September 16, 1938. While in jail he was taken by an officer of the Highway Patrol to the Department of Public Safety, located at 10th and Broadway streets, in Oklahoma City, and there made a statement in writing which he signed and swore to, giving the details of the tapping of the pipe line as above outlined.

He testified that the statement made by him was a voluntary statement; that he was in no way promised immunity; that the written statements made by him and the defendant Verl Leathers were made at the office of the Department of Public Safety, and were made before they were taken to the office of the county attorney. He said: "A. I says, 'Well, I am out of a job, and this is going to be dogging me from now on, and I want to come clear and tell the truth and take my penalty and get it over with'". He signed his statement on the 14th or 15th day of September, 1938.

The defendant Verl Leathers was arrested at Fittstown, near Ada, in Pontotoc county, and placed in the Oklahoma county jail on the 16th day of September, 1938.

The witness Harrold E. Hicks was brought there, and when he confronted Coleman he told him he had made a statement, and that he, Coleman, had better tell the truth. The defendant Coleman then signed a written statement which he swore to, giving the facts as above outlined. In this statement he said: "I have made this statement of my own free and voluntary accord, without threat or fear of violence and without promise of immunity."

The next day, September 16, 1938, the defendant Verl Leathers was taken to the office of the Department of Public Safety, and the witness Harrold E. Hicks was present and about the same proceedings were had as when the defendant Ben Coleman made his statement. The defendant Leathers made a written statement, and said that he was making the same of his own "free and voluntary accord, without threat or fear of violence and without promise of immunity".

The defendant Leathers took the witness stand and testified that at the time he made the statement it was not a voluntary statement, and "that they told me they were after Jack Shaffer, and if I would sign it they would turn me loose." On cross-examination he stated that the parties who told him they would turn him loose were Roberts and Salley. They were taken to the office of the county attorney the next day and there before a justice of the peace had their examining trial. There was no testimony that the county attorney, or any of his assistants, or any public officer of Oklahoma county ever at any time promised either of the defendants immunity if they would make any statement.

The Oklahoma Constitution, section 27, article 2, Okla. St. Ann., provides when immunity may be claimed in this state, and is as follows:

"Any person having knowledge or possession of facts

that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the state, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the state; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence."

In the trial of this case it was contended by the defendants, who were tried together before the court, that they were "taken before the county attorney and coerced and compelled into furnishing information and making a statement of fact later to be used against them in the development and preparation of said charges." That for this reason they were as a matter of law granted immunity under the above section of the Constitution of this state, and should be discharged.

To sustain this contention the case of Bram v. United States, 168 U. S. 532, 533, 18 S. Ct. 183, 189, 194, 42 L. Ed. 568, is relied upon, and is the only case cited in defendant's brief. This is a noted case, and the opinion was written by Justice White prior to his becoming Chief Justice. A strong dissenting opinion was written by Justice Brewer, and concurred in by Chief Justice Fuller, and Justice Brown. Time and space forbid a complete analysis of this case. It arose out of the murder of the captain of a boat, his wife, and a seaman, upon a boat on the high seas. The defendant, Bram, with another were taken in charge, and after being questioned by a police detective at Halifax, where the boat landed, a charge of murder was afterwards filed. The question involved was with reference to a statement made by the defendant Bram to questions propounded by the detective, while the defendant was under arrest and prior to the filing of the indictment. Justice White, in a lengthy opinion, reviews

the decisions of the early English Courts, the Criminal Court of Appeals of England, and many leading decisions from the courts of the United States with reference to the law as applied to "confessions" by parties charged with crime. Time forbids a consideration of these cases. They may be read in this opinion by those interested. Justice White, after a review of many cases, says:

"In approaching the adjudicated cases for the purpose of endeavoring to deduce from them what quantum of proof, in a case presented, is inadequate to create, by the operation of hope or fear, an involuntary condition of the mind, the difficulty encountered is that all the decided cases necessarily rest upon the state of facts which existed in the particular case, and therefore furnish no certain criterion, since the conclusion that a given state of fact was adequate to have produced an involuntary confession does not establish that the same result has been created by a different, although somewhat similar, condition of fact. Indeed, the embarrassment which comes from the varying state of fact, considered in the decided cases has given rise to the statement that there was no general rule of law by which the admissibility of a confession could be determined, but that the courts had left the rule to be evolved from the facts of each particular case. 2 Tayl. Ev. § 872. And, again, it has been said that so great was the perplexity resulting from an attempt to reconcile the authorities that it was manifest that not only must each case solely depend upon its own facts, but that even the legal rule to be applied was involved in obscurity and confusion. Green v. State, 88 Ga. 516, 15 S. E. 10 [30 Am. St. Rep. 167]; State v. Patterson, 73 Mo. 695, 705; State v. Matthews, 66 N. C. 106, 109."

He does not agree in full with the above reasoning, and says:

"The first of these statements but expresses the thought that whether a confession was voluntary was primarily one of fact, and therefore every case must depend upon its own proof. The second is obviously a misconception, for, however great may be the divergence between

the facts decided in previous cases and those presented in any given case, no doubt or obscurity can arise as to the rule itself, since it is found in the text of the Constitution. Much of the confusion which has resulted from the effort to deduce from the adjudged cases what would be a sufficient quantum of proof to show that a confession was or was not voluntary has arisen from a misconception of the subject to which the proof must address itself. The rule is not that, in order to render a statement admissible, the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient that the making of the statement was voluntary; that is to say, that, from causes which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement when but for the improper influences he would have remained silent."

After a review of the many English and American decisions he comes to the conclusion:

"We come, then, to the American authorities. In this court the general rule that the confession must be free and voluntary—that is, not produced by inducements engendering either hope or fear—is settled by the authorities referred to at the outset. The facts in the particular cases decided in this court, and which have been referred to, manifested so clearly that the confessions were voluntary that no useful purpose can be subserved by analyzing them. In this court also it has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison or was drawn out by his questions, does not necessarily render the confession involuntary; but, as one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether or not the statements of the prisoner were voluntary. Hopt v. Utah, 110 U. S. 574, 4 S. Ct. 202 [28 L. Ed. 262]; Sparf v. United States, 156 U. S. 51, 55, 15 S. Ct. 273 [39 L. Ed. 343, 345]. And this last rule thus by this court established is also the doctrine upheld by the state decisions.

"In the various state courts of last resort the general rule we have just referred to, that a confession must be voluntary, is generally recognized."

After a review of the facts he comes to the conclusion that under the circumstances and facts in that case that the statements made by the defendant, Bram, to the police detective were not voluntary and were inadmissible. As heretofore stated, the dissenting opinion of Justice Brewer just as strongly states that in his judgment the statement was voluntary, and that the evidence was properly admitted.

There are many distinguishable facts in the Bram Case and the case at bar. It is not necessary that they be set out in this opinion. The cases from this state have often held in construing the constitutional provision above quoted, that in any agreement for immunity the witness must have testified under agreement with the prosecuting attorney, approved by the court, or must have claimed privilege which was denied. Scribner v. State, 9 Okla. Cr. 465, 132 P. 933, Ann. Cas. 1915B, 381; Rudolph v. State, 32 Okla. Cr. 265, 240 P. 761; Morrison v. State, 49 Okla. Cr. 369, 294 P. 825; McConnell v. State, 18 Okla. Cr. 688, 197 P. 521; Eden v. State, 54 Okla. Cr. 265, 21 P. 2d 775.

See the case of Mays v. State, 19 Okla. Cr. 102, 197 P. 1064, for a full discussion of the question of voluntary and involuntary statements.

The facts in the instant case clearly show that no agreement was made with the county attorney, his assistants, or any other officer of Oklahoma county, as to his having immunity by reason of any statement which he might make. The statements were made and signed and sworn to before either of the defendants was ever taken to the county attorney's office. It is true that they were

under arrest at the time, and were confined with a code-fendant, who informed them that he had made a statement telling the truth, and that they had better do likewise, and get it off their mind. This cannot be held to be sufficient to justify them in claiming immunity under the law and Constitution of this state. If such was so held to be the law justice would be defeated many times, and the guilty would go unpunished. Certainly someone in authority, clothed with the responsibility of public office, and upon whom this responsibility rests, should be the one to determine when immunity should be granted under the provision of the Constitution above quoted. This, to our minds, was the clear intention of the framers of the Constitution at the time of the writing of this provision.

This court, in a late case written by the writer of this opinion, has had occasion to discuss this question in the case of Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015. In that case the same was reversed for the reason that a police officer was permitted to testify to a conversation with the defendant while in the county jail awaiting trial, to a conversation which was practically a confession. The facts were much stronger than in the Bram Case to which reference has heretofore been made. Paragraphs 1 and 2 of the syllabus state the rule which we think governs. They are:

"1. The mere fact that a confession is made to a police officer while the accused is under arrest in or out of prison, or is drawn out by his questions, does not necessarily render the confession involuntary; but as one of the circumstances such imprisonment or interrogation may be taken into account in determining whether or not the statements made by the prisoner are voluntary.

"2. A confession in order to be admissible must be free and voluntary. It must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, nor by the exertion of any improper in-

fluences. 1 Greenleaf on Evidence (15th Ed.) sec. 219; Wharton on Criminal Evidence (9th Ed.) sec. 631; Bishop, New Crim. Proc., sec. 1217; 3 Russell on Crimes (6th Ed.) section 478."

It will be noted that in this case the officer who had the conversation with the defendant induced defendant to believe that if he entered a plea of guilty he would only receive a punishment of two years in the penitentiary, and that this statement was made after the officer had conferred with the county attorney from whom he claimed to have received this information. After this conversation was had the county attorney changed the information charging defendant with a greater crime and his punishment was assessed at 30 years in the penitentiary. Under these circumstances it was held that the evidence was inadmissible, and we think properly so.

We have devoted some time to the discussion of this proposition for the reason of its importance, and its frequent occurrence in the trial of cases in this state. May we suggest that the duly constituted officers and courts of this state should be very careful to see that the rights and liberties guaranteed to the citizens of this state, under the law and the Constitution, are properly safeguarded. The law fully provides the duties of an officer when a defendant is placed under arrest. The plain mandates of the law should be followed by the officers. This does not mean that the officer should in any way be deterred in ferreting out crime. He is to be commended for this, but it should be done in a manner prescribed by the Constitution and laws of this state.

The defendants in this case were tried before the court without the intervention of a jury. Under our practice the question of whether a statement made was voluntary or involuntary is left to the jury for their decision. It is

presumed that the court only considered that evidence which was proper and that the law of this state was properly applied. Capshaw v. State, 69 Okla. Cr. 440, 104 P. 2d 282.

From an examination of this record we find no error, and the judgment and sentence of the district court of Oklahoma county is therefore affirmed as to each of these defendants.

DOYLE, P. J., and JONES, J., concur.

On Rehearing.

BAREFOOT, J. Oral argument was presented at the rehearing of this case; and the county attorney stated that the sentence of the defendant Jack Shaffer had been suspended by the court, and he had not served any time in the penitentiary after his plea of guilty in this case. It was also shown by the record that he was not only the principal offender, but that he received the greatest reward as a result of the tapping of the pipe line. It was further called to our attention that the defendant Jack Shaffer only received a sentence of 18 months in the penitentiary; and at the time these defendants were sentenced, the assistant county attorney who tried the case recommended a sentence of two years, but stated: "Since the court suggested that in his own mind he felt like 18 months was enough, we have no objection to that."

It then appears in the record:

"The Court: Of course, at the time I made that suggestion I supposed the matter was being cleaned up. Of course, if they want to appeal, they ought to have something to appeal from. Mr. White: If that is your view of it, I could not help it. I don't think any man— The Court: You don't want to deny the man his right to appeal? Mr. White: The man should not be penalized. The Court: I don't think so. I thought the matter was com-

pletely washed up, and I was knocking off six months in view of the fact the court would not be burdened with the matter any more. Now, if they want to appeal, I would not for a moment deny them that right, but they ought to be given something to appeal from. Don't you think that is right? Mr. White: Since your Honor has asked me, I would not dictate that into the record. No; I don't think it is right. I don't think any premium ought to be set on a man who just surrenders what he thinks is his legal rights, nor any punishment ought to be administered to him because he insists on his legal rights."

Under the circumstances as above stated, we are of the opinion that justice would best be served by reducing the sentence of each of the above-named defendants, Ben Coleman and Verl Leathers, from two years in the penitentiary to 18 months in the penitentiary.

It is, therefore, ordered that the judgment and sentence of the district court of Oklahoma county be, and the same is hereby, modified from two years in the penitentiary to 18 months in the penitentiary, and, as so modified, is affirmed.

DOYLE, P. J., and JONES, J., concur.