# KILLOUGH v. STATE.

No. A-11324. April 18, 1951.

Rehearing Denied May 16, 1951.

(231 P. 2d 381.)

Champion, Champion & Wallace, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and J. Walker Field, Asst. Atty. Gen., for defendant in error.

JONES, J. Defendant, Andrew Jackson Killough, was charged by an information filed in the district court of Carter county with the crime of murder; was tried; convicted of manslaughter in the first degree with the punishment to the court. The court thereafter sentenced the defendant to serve a term of seven years imprisonment in the State Penitentiary, and he has appealed.

No question as to the sufficiency of the evidence has been raised so it is not necessary to give an extended review of the evidence. It is sufficient to relate that the state's evidence showed that defendant shot and killed one George Tucker about 12:30 a. m. on October 29, 1948, just outside of a beer tavern owned by the father of the deceased near the town of Healdton. Mrs. Mildred Carter, Emmett (Popeye) Vanderburg and Dovie Killough, the wife of the defendant, were witnesses to the homicide. Vanderburg and Mrs. Carter testified

for the state but the wife of the defendant was not used as a witness. Mrs. Killough and her husband had been separated for about seven months. Mrs. Carter had married the stepson of defendant and he had been killed in the war. At the time of the homicide Mrs. Carter was living with Mrs. Killough. On the night of the shooting Mrs. Carter, Mrs. Killough, and the deceased were talking outside of the tavern when the defendant, who had been drinking heavily, approached them and ordered his wife to go home with him, but she refused because she said he was too drunk and that she would go home with Mrs. Carter. The defendant came back a third time and had a 20 gauge shotgun in his hand. Mrs. Killough asked Vanderburg to take the gun away from the defendant but he did not do it. The defendant told George Tucker, "I don't want you shacking up down at my house anymore." Tucker took a step towards defendant and defendant said, "Don't take another step", and fired. Tucker fell to the ground. Killough walked up to him and said, "I see I didn't kill you, you son of a bitch", and he raised the gun and fired a second shot into the head of the deceased and said, "Now die you bastard". The defendant and Vanderburg left in the car and defendant was arrested later that night. At the time of the defendant's arrest he stated to the deputy sheriffs that he had shot George Tucker and hoped he had killed him, that if he didn't, he would as soon as he got another chance.

The defendant testified in his own behalf, stating that after he had ordered the deceased not to shack up at his house anymore that the deceased started charging towards him like a wild animal and said he would kill defendant; that defendant ordered him not to come any closer, and the deceased reached for his right hip, at which time defendant fired. When asked whether he fired the second shot while the deceased was lying prone on the ground at the time he allegedly made the statement, "Now die you bastard", the defendant said, "I can't say I did or didn't, I don't remember exactly all that did happen after the shooting".

The proof showed that the deceased was unarmed.

The first proposition presented by defendant is that the court committed error in allowing the prosecution to refer to an unsigned typewritten confession allegedly made by the defendant. On cross-examination of the defendant he was asked by the prosecutor if he remembered the next morning after the homicide being in the office of the county attorney and talking to the assistant county attorney and to deputy sheriffs concerning the evidence surrounding the killing of George Tucker, to which question the defendant answered, "Yes, sir". The record then reveals the following:

"Q. There you were asked this question: 'Late in the evening of Friday, October 29, 1948, I had been drinking whisky and a bottle or two of beer, and was pretty tight?' By Mr. Wallace, of counsel for defendant: If your Honor please, we think that we should have a hearing on this outside the presence of the jury. By the Court: All right, gentlemen of the jury, you will please retire from the court room to the jury room at this time, and you will be under the usual admonitions not to discuss this case."

After the jury had retired, counsel for defendant objected to the question for the reason the prosecutor was reading from a typewritten page not signed by the defendant and, "no background was laid in regard to its competency". During the colloquy between counsel and the court the court stated in referring to the question asked defendant, "That can be asked, the statement itself is not admissible". After further discussion the court held in substance that the burden was on defendant to prove that the statement was not voluntary, at which counsel for defendant requested permission to put on evidence pertaining to

the statement, which permission was granted. The defendant then testified in response to questions by his counsel that he did not sign the statement from which the prosecutor was reading and that he did not sign it because all the statements therein contained were not true. On cross-examination he was asked if he didn't tell the assistant county attorney the reason he didn't sign it was because the lawyer told him not to do so, to which defendant answered, "I don't remember whether I told him that or not". He was then asked, "Did you read it over?", to which he answered, "I don't know that I did". No further questions were asked by counsel for either side. The objection to further questioning concerning the statement was again interposed and the court overruled it. The jury was returned to the courtroom and in the presence of the jury the prosecutor refreshed his own recollection by referring to the typewritten statement and asked the accused whether he had given certain answers to the assistant county attorney, concerning the homicide, which conversation allegedly occurred in the office of the county attorney the day following the shooting. The record disclosed the following:

"Q. You made a statement to the Assistant County Attorney? A. I tried to make some kind of a statement, I wasn't advised of my legal rights, I tried to tell him. Q. What you told him was true? A. I wouldn't say it was true, I tried to make a truthful statement. * * * Q. (By Mr. Sigler): I will ask you this, if you didn't make these statements to the Assistant County Attorney, late in the evening of Friday, October 29th you had been drinking whiskey and a bottle of beer and were pretty tight, did you tell him that? A. I don't remember whether I told him that or not. Q. It is true? A. I don't know. Q. And didn't you make this statement, 'I drove up in front of Bert Tucker's Tavern on the south side of Healdton, I picked up Vanderburg, I don't know exactly where I picked up Vanderburg,' did you make that statement? A. I don't recall whether I made it exactly that way or not. Q. Was it in substance true? A. That I picked Vanderburg up? Yes. Q. And didn't you make the statement that later on you drove back to Bert Tucker's place and George Tucker and Mildred Carter and Dovie Killough were standing out by the car? A. They were standing out in front of the car. Q. And didn't you make the statement, 'I got out of my car and asked Dovie, who was my former wife, why she did not go home? A. I did ask her. Q. And you made this statement, 'She said she didn't have any way, and I asked her if she didn't want to go home with me'? A. I asked her if she wanted me to take her home. Q. And you made this statement, 'She said she wasn't about to go home'? A. That was something similar. Q. And you made this statement, 'We argued about them bringing the fellows up to the house and I told them I didn't want that kind of stuff going on any more'? A. To the best of my knowledge. Q. And you made this statement, 'That you told George you meant him too'? A. Yes. Q. And you made this statement, 'I turned around and went back to my car and got in, Vanderburg was there, that is when I got the shotgun in my hand'? A. After I got back in the car? * * * Q. And you made this statement, 'George Tucker was a good friend of mine, we never had had no trouble at all'? A. We never had had any trouble, we were friendly until this happened. * * * Q. And then you said, 'I did not see anything in George's hand and he came within about ten feet of my car and I told him not to come any closer, he took a step or two and then I got out of my car and shot George in the belly,' Did you tell him that? A. I don't remember the exact words. Q. What did you say then? A. What did I say? Q. Yes, if that wasn't right, what did you tell them? A. What did I tell George at the time? Q. No, what did you tell the Deputy Sheriff and the Assistant County Attorney, when you were talking with them, that is what I am talking about. A. I don't remember exactly. Q. 'He fell down and then I stood over him and shot him again'? A. I don't remember making any such statement. * * * Q. 'Mildred and Dovie ran and then Mildred came back and stooped over him and said, 'Why did you kill George?' And I got in the car with Vanderburg and drove through Healdton, I had some whiskey before the shooting took place, and both Vanderburg and I drank and I asked Vanderburg where the whiskey we had was, he said it was all gone, we then drove out to Ross Austin's place

northwest of Healdton and I gave a check for $7.50 and bought some more whiskey and started back toward Healdton, I stopped to put him out and drove back to Ross' place.' Is that what you said? A. I think that is what I said, yes, sir. Q. 'I returned to Ross' and got my gun and went directly to Bill Schrader's place northeast of Healdton, went back to Healdton and went to Arthur Johnson's place, I told him what I had done and he said he already knew it, that the officers had already been looking for me.' A. Arthur Johnson told me that they had been there. Q. 'I then gave him a drink of whiskey and I then went to Beacher Schrader's place where I was arrested'? A. I was arrested there. Q. 'I never had any trouble at all with George Tucker and considered him my good friend, I am sorry I killed George and I realize I have gotten myself in a bad jam.' A . I am sorry I had to do it."

Counsel for defendant correctly quote the rule followed by a majority of the courts that a defendant in a criminal case who is a witness in his own behalf cannot be compelled on cross-examination to testify concerning a confession made by him out of court which was involuntarily given, notwithstanding the fact that the evidence is offered by the prosecutor not as a confession, but merely as a contradictory statement, for the purpose of impeaching the defendant as a witness in his own behalf. Cross v. State, 142 Tenn. 510, 221 S. W. 489, 9 A. L. R. 1358.

We find no fault with this rule and in a proper case, where the facts would justify it, the application of the rule would probably be upheld. However, in the instant case there was no evidence at all that the alleged confession made by the accused was involuntary. When he was called as a witness to testify concerning the giving of the statement, not a single question was asked by his counsel as to whether the confession was voluntary and defendant did not either in his direct or cross-examination testify that the statement was given through force, threats, coercion, or because of undue influence or promise of benefit. The county attorney did not offer the confession in evidence as a part of the state's case in chief. Evidently from what was said, he did not offer the statement because it was not signed by the defendant after it had been typed by the stenographer for the county attorney. But irrespective of that, in the absence of any evidence to show that the confession was involuntarily made, the court's ruling would certainly have to be sustained. When a defendant takes the witness stand he becomes subject to cross-examination the same as any other witness and he may be asked if he has not made certain statements out of court inconsistent with his testimony in the cause.

The second proposition presented in the brief of the defendant is that the court erred in admitting evidence tending to prove offenses other than the crime for which defendant was on trial.

This objection is directed at the testimony of the witness Vanderburg. This witness testified for the state that he was with the defendant at the time the shooting occurred and left the scene of the shooting immediately afterwards; that about two miles out of Healdton they stopped at a place to get some whisky; that while they were in Ross Austin's to get some whisky Vanderburg put the gun on defendant and the two came together and started fighting. Counsel moved for a mistrial on the grounds that they were attempting to try the defendant on a charge not alleged in the information, which was overruled. He then made a motion for the court to strike all the testimony concerning the occurrences between Vanderburg and the defendant after the shooting, which motion was sustained and such evidence was stricken from the consideration of the jury. In support of this proposition counsel for defendant cite the general rule set forth in a large number of cases, to wit: That when a defendant is put upon trial for one offense, he is to be convicted, if at all, by evidence

which shows that he is guilty of that offense alone. Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273; Michelin v. State, 66 Okla. Cr. 241, 90 P. 2d 1081.

We think the trial court was more than fair with the defendant when he struck this evidence from the consideration of the jury and instructed them not to consider the same for the reason that under the record this evidence related to what occurred immediately after the shooting in connection with the flight of the accused from the scene of the homicide, and his actions and demeanor shortly after the homicide in connection with his flight were admissible even though incidentally the same might refer to another offense committed by the accused in his flight. Courts should be careful, however, where the question of other offenses becomes involved, to not permit details to be given so as to allow the jury to give undue weight to the other offenses allegedly committed by the accused. Under the record before us the action of the court in striking this evidence from the consideration of the jury was more favorable to the defendant than was authorized under the law.

It is further contended that the physical condition of one of the jurors prevented him from giving careful and conscientious attention to the case, and the verdict therefore did not represent his deliberate conviction of guilt.

In connection with this assignment of error, one D. D. Kennedy testified on the motion for new trial that he was a rancher, 56 years of age and had sat on the trial of the case of State v. Arthur Clark on Tuesday, May 3, 1949, before the commencement of the trial of defendant on Friday, May 6th; that the Clark case commenced at 9 o'clock a. m. and continued all day and on into the night; that the jury reported to the court about 5 o'clock a. m. on Wednesday, May 4th, and that he did not get home until after daylight; that he returned to court again on Thursday morning, May 5th, at 9 o'clock a. m., did not serve on the jury that day and returned again on Friday morning, May 6th, and was selected on the jury for the trial of the defendant Killough, which started at 9 a. m.; that the case was tried without unusual recesses on that day and into the night. The juror testified that he took a headache during the trial but he did not mention it to any of the other jurors nor to the court because he did not want to mess up everything. He then testified that he voted in the jury room to find the defendant not guilty, and then the question was asked, "Tell the court why you let them bring in a verdict like that?", to which he answered, "Well, I was just worried, I had to stand out against all of them.. I shouldn't have done it. I know that, but if I had felt like anything, I wouldn't have done it."

It is contended by counsel that the defendant is not attempting through this evidence to have the juror impeach his verdict but because of the illness of the juror the evidence shows that the verdict did not express his deliberate conviction of the guilt of the accused.

This court has long been committed to the rule that jurors will not be permitted to impeach or contradict their verdict by affidavits or otherwise after they have been discharged from the jury and mingled with the public. Spencer v. State, 5 Okla. Cr. 7, 113 P. 224, 226; Vanderburg v. State, 6 Okla. Cr. 485, 120 P. 301; Neighbors v. State, 56 Okla. Cr. 108, 34 P. 2d 290; Martin v. State, 92 Okla. Cr. 182, 222 P. 2d 534; Ex parte Lewis, 92 Okla. Cr. 334, 223 P. 2d 143. In Spencer v. State, supra, this court said:

"Jurors cannot be heard to impeach their verdict unless expressly authorized to do so by statute, and then only in the manner provided by statute. When jurors are impaneled, they are sworn to decide the case submitted to them according to the law and the evidence. For a juror to make an affidavit that he has violated his oath and rendered a verdict upon any other ground than the sworn evidence in a case places him in contempt of court. * * *

"If, after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, judgments based upon verdicts of juries would rest upon a very uncertain foundation. Litigants against whom verdicts had been rendered would be continually importuning jurors and attempting to obtain from them affidavits upon which such verdicts could be assailed. This would result in perjury and bribery. There would be no end of litigation in cases tried before juries. Therefore, for the security of litigants, and to prevent fraud and perjury, as well as for the protection of the jurors themselves, courts will not allow jurors to impeach their own verdict unless they are permitted to do so by the express provision of the statute. We have no statutes permitting this to be done."

The Supreme Court of Kansas, in the case of State v. Keehn, 85 Kan. 765, 118 P. 851, 856, gave a lengthy discussion of the law pertaining to affidavits or evidence of jurors to be introduced on a motion for new trial for the purpose of affecting the verdict. We quote a part of that opinion:

"The defendant produced the affidavits of the two jurors who were the last to agree to the verdict, stating that they were induced to do so by the letter to the judge, whom they understood and believed had power to lower the degree of the crime to manslaughter. The court properly declined to consider these affidavits. They contradicted that which in the solemn discharge of a sworn duty the men making them had asserted. State v. Horne, 9 Kan. 119, 132. The true rule and the reason for it were long ago announced by this court in the following language: 'In Wright v. I[llinois] & M. Telegraph Co., 20 Iowa 195, Cole, J., after a full consideration of the authorities, thus states the conclusion to which the court arrives: "That affidavits of jurors may be received for the purpose of avoiding a verdict to- show any matter occurring during the trial, or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts of merits of the cause out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot or game of chance or other artifice or improper manner, but that such affidavit to avoid a verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the court, the statements of the witnesses, or the pleadings in the case; that he was unduly influenced by the statements (or otherwise) of his fellow jurors, or mistaken in his calculations of judgment, or other matter resting alone in the juror's breast." * * * This quotation from the opinion of Mr. Justice Cole seems to us to state very clearly and correctly the law applicable to questions of this kind. As to all those matters lying outside the personal consciousness of the individual juror, those things which are matters of sight and hearing, and therefore accessible to the testimony of others, and subject to contradiction, "overt acts," as the Massachusetts court expresses it, it seems to us that the interests of justice will be promoted, and no sound public policy disturbed, if the secrecy of the jury box is not permitted to be the safe cover for the perpetration of wrongs upon parties litigant. * * * Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony. It gives to the secret thought of one the power to disturb the expressed conclusions of 12. Its tendency is to induce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict.' Perry v. Bailey, 12 Kan. 539, 544." (Emphasis ours).

Applying the law set forth in the above case to the case at bar, it appears that the matters testified to by the juror Kennedy rested solely in the juror's breast and that public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because, being personal, it is not accessible to other testimony.

The record herein would certainly have sustained a much heavier sentence than was meted out to the accused by the court. The evidence of the state would have sustained a conviction for murder, while the testimony of the defendant himself was so weak and indecisive that any reasonable juror with due regard for his oath of office would have been bound to have found the defendant guilty of manslaughter in the first degree based on his evidence alone. There are no material errors in the record. The judgment and sentence of the district court of Carter county is accordingly affirmed.

BRETT, P. J., and POWELL, J., concur.