**Roy L. WYATT, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant In Error.**

**No. A–12258.**

Criminal Court of Appeals of Oklahoma.

March 28, 1956.

Rehearing Denied April 25, 1956.

Morgan & Morgan, Watonga, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Roy L. Wyatt, plaintiff in error, hereinafter referred to as defendant, was in the district court of Blaine County, Oklahoma, charged by information with the crime of assault with a dangerous weapon, was tried before a jury, convicted, and the jury being unable to agree upon the punishment, the same was left to the court, who fixed the penalty at five years confinement in the State Penitentiary. The case is here on appeal.

Counsel admit in the beginning that there was sufficient evidence for submission of the case to the jury. No complaint is made as to the instructions or errors at trial, but it is asserted that the punishment assessed is excessive. It is argued that the jury did not deliberate over the issues long enough. It is pointed out that the record shows that the defendant, the prosecuting witness and all the other witnesses except two officers were colored people. Counsel urges "From a consideration of all the evidence presented by the State, and the particular facts in this case, the writer respectfully contends that the ends of justice would be met by a modification of the sentence imposed from a five year term in the penitentiary, to a short term in the county jail."

Counsel have presented an excellent and persuasive brief. But a careful, objective study of the entire record presents a different picture.

The evidence on the part of the State shows that the prosecuting witness, Matthew Johnson, nicknamed "Buster" and who went by the family name of his step-father, rather than that of his own father, whose name was Hodges, visited the Dew Drop Inn in Watonga on February 5, 1955, around 6:30 or 7 P. M. He observed the defendant, Roy L. Wyatt, "sitting over there talking to a man" ; that witness purchased a quart bottle of beer and took it over to the manager, Ruth Johnson, as a gift from him. She was his aunt by marriage. Witness walked over to the stove where he saw one Buford Randall and commenced to talk to him, and the defendant walked up and told witness that he had stepped on his foot, and witness said, "I told him no, I wasn't on his foot" and "Well, he hauled off and hit me, and knocked me over the stove, and then while he was doing that he said something about—said I had snitched on him, or something." Witness said that defendant hit him with a gun and when he saw a gun he just put up his hands. Witness said that defendant knocked him down and then reached down and picked him up and that he had a .45 calibre automatic pistol, army type, and he snapped it

on him twice but it failed to go off; that defendant backed him to the door way, and witness backed out of the cafe, and defendant snapped the pistol on him again and the pistol jammed and defendant was trying to get it "unjammed" and Bud Johnson came up and, said witness, "Well he just hauled off and struck it [the pistol] in his belly and told him to get back or he would kill him too." Witness took advantage of the opportunity and got away, running across the street to Andrew Russworm's store, and spoke to Sam Harris, who operated the place, and he then discovered that Officer A. L. Beauchamp, commonly called "Red", was over at the cafe and he then went to see the officer to report what had happened.

Witness claimed that he had not caused a warrant to be issued against the defendant as defendant claimed, and had not stepped on his foot. He said that he first got acquainted with the defendant many years before, when they both were serving time in the penitentiary at McAlester.

On cross-examination this witness admitted that after he got off from work as a laborer on February 5, 1955, that he had gone home and had taken a bath and cleaned up and had taken a small drink of whiskey before going to the Dew Drop Inn, but said that he did not drink beer and had drunk no more liquor prior to his trouble with the defendant.

■ Witness was severely cross-examined concerning the automatic "snapping" but he demonstrated that he knew the "click" of the hammer when caused to "snap". He said that out of doors defendant tried to "reject" the shell, but he illustrated what he meant by showing that defendant with one hand had pushed the slide back which this court will take judicial notice has the effect of ejecting the shell in the barrel and if the pistol mechanism is working right, causing a new shell to go from the clip or magazine into the barrel. The .45 calibre army type Colt automatic was used by defense counsel in his cross-examination of defendant.

Witness was asked what happened to Buford Randall when defendant came up and jumped on witness. He said: "Yah, he [Randall] was the one that hollered 'gun', because if he hadn't hollered 'gun' I would have grabbed Wyatt, but after I seen there was a gun why I didn't do nothing but just throw up my hands." He said that Buford "just broke and ran" and that he would not now admit that he had seen a gun.

Buford Randall testified that he was standing with Buster Johnson in the Inn at the time in question, and that the defendant came over and stepped between him and Buster and began slapping Buster with his hand. He said he did not see anything in defendant's hand. He said he heard Buster say, "What is the matter with you,—I aint done anything to you". Witness said that he got away as quickly as he could, going out the back way.

Ruth Johnson testified that she was Buster Johnson's aunt by marriage; that on the night in question: "Well, I was sitting in a booth, and Buster Johnson come in and he bought a quart of beer and set it down on the table, and we got two glasses, and of course he poured it. And he went out to shoot pool and left there, and Mr. Wyatt come up and he seemed to think he bought it, and he said he did, and I told him he didn't that Buster Johnson bought it and I left. I went home." She said that she was not there when the scuffle took place, and that there was no trouble between the parties before she left.

James Hodges, uncle of the prosecuting witness and who was also known as Bud Hodges and as Bud Johnson, said that on the night of February 5, 1955, he was approaching the front of the Dew Drop Inn in Watonga. Witness testified:

"Uh-huh—well, when I came up there,—when I came up where they was arguing at, they was pretty near out in the street,—they was just about out in the street there. Mr. Wyatt had one hand,—his left hand,—ahold of Buster's collar and was backing him off, you know, whipping him over the head with a gun, and so I heared them before I got there,—Buster was hollering, he says, 'Well', he says, 'You can kill me if you want to',—he says, 'You can kill me',—he says, 'I ain't done a thing

agin you',—and he says, 'I am going to kill you', and he was whipping him and Buster was hollering, you know—

"Q. Who said he was going to kill who? A. Well Wyatt was telling Buster he was going to kill him. Then when I got up there, well he had the gun, you known, and he was just whipping him over the head and shoulders,—he was dodging and he was trying to hit him over the head, and was hitting him over the head, snapping that gun.

"Q. This was outside the building? A. Yeh, that was on the outside,—on the outside of the building. Well I came up there, and I said, 'What is going on,—what is the matter with you fellows,—what is going on?'—and I just started out there where they was at, and so when I got to where there was a car parked up against the curb well I got to the tail end of the car,—I think the car was Buford Randall's—I got to the tail end of this car and Wyatt hollered,—he said, 'Get back,—don't you come up here,—don't you come up here', and then at that time he whirled. So I got to the tail end of this car and whirled up against a fender, and he rushed me then.

"Q. Who did? A. Wyatt did,—he rushed me, and he said, 'Get back',—he said, 'I will kill you, you black son-of-a-bitch', he says, 'I'll kill you', and he jabbed that gun in my stomach.

"Q. Who did? A. Wyatt did,—he jabbed the gun in my stomach and he snapped it twice,—just jobbed me, you know, and every time he would job me he would snap the gun,—he jobbed me twice in the stomach, and then I backed on up then, I backed on up and by that time why he let Buster go to get after me, and Buster stole out,—he broke and run,—Buster broke and run,—he took off towards the Armory building. And he looked around and he seen that Buster was gone, and he says, 'Come back here, Buster, you son-of-a-bitch, I want to kill you.', and he turned and snapped the gun on him going across the street.

"Q. Then what happened? A. Well, I don't know what happened then; he walked on around the car.

"Q. Who did? A. Mr. Wyatt,—he walked on around the car and went on east. The last time I seen Buster he was going along by Andrew Russworm's store there.

"Q. You didn't try to stop Wyatt, did you? A. Oh, no,—I didn't try to stop him,—I just got back up on the sidewalk."

This witness on cross-examination demonstrated that he knew the difference between the sound of a gun when the hammer would be back and the trigger squeezed, and when the hammer was not in a cocked position.

Dave Long, night watchman at Watonga, testified, said that he was acquainted with both the prosecuting witness and the defendant. He said that the police got a call that there had been trouble at the Dew Drop Inn and he and officer A. L. "Red" Beauchamp got to the scene about the same time, and they found the defendant a short distance away, behind an abandoned filling station and cafe; that they "loaded" defendant in a car and took him home. Witness stated that he and officer Beauchamp later found defendant's gun behind the cafe and filling station where they first found him. He said the pistol was an automatic .45 Colt; that they found defendant hunting the gun and defendant said he was looking for his pocket knife.

Officer A. L. Beauchamp testified substantially as officer Long, but more in detail concerning the finding of the pistol. He testified in part as follows:

"A. When I first seen him, he was behind an abandoned service station in the 300 block, West Main.

"Q. What brought about your seeing him there? What were the circumstances? A. Well, I was parked in my car down on Main Street, in front of the Ball Jewelry Store, and there was a lady drove down the street in a car—came from the west,—and she hollered and said, 'They are having

some trouble up in front of the Dew Drop Inn', so—

"Q. Following that you went on up there? A. Yes, I drove on up there.

"Q. And what did you find when you got up there? A. Well, before I got there,—I was about half a block east of the Dew Drop Inn,—I met Buster Johnson coming down the street, hollering, trying to *waive* me down. Well, I didn't see no one following him, so I knew the trouble was up there, so I didn't even stop. I drove on up and parked my car in front of the Dew Drop Inn, and as I got out someone said Mr. Wyatt had gone around the corner of this abandoned station and had a gun, so I got back in my car and drove around behind this station and when I got to where I could shine my lights back behind the station why he was there, and he was walking east,—he was walking east,—and I just stepped out of the car and said, 'Hey, Roy, where are you going?'—and he turned around and came back towards me, and we talked,—I don't remember just what we said,—but anyhow, I shook him down, because he had been accused to me as having a gun, and I shook him down,—he didn't have no gun.

"Q. He didn't have a gun? A. He didn't have a gun on him, and I asked him what he done with that gun, and he said, 'Red, I ain't got no gun', so we put him in the car,—I just told him to get in the car and he got in, and just as he got in,—Mr. Long was with me,—Wyatt got in the back seat and Mr. Long started to get in the front,—Buster Johnson ran up there,—he had gotten back by this time,—he ran up there and he said, 'Watch him, Red, he's got a gun', and I said, 'No, he doesn't have no gun', and he said, 'Well he hit me with a gun,—he hit me up the side of the head', and he stuck his head inside the car and he had been hit along here (indicating)—there was blood on that side of his face (indicating right side of face). And he and Wyatt passed a few words like they was wanting to fight, and I told Buster, I said, 'Just you go on away and leave him alone', and closed the door and drove off and left Buster standing there. So I taken Wyatt,—we drove around for approximately ten minutes while I was talking to him, trying to find out what had happened, and he said that Buster had been stepping on his toes,—I don't know whether he meant that literally or just what he meant by it, but he said Buster had been stepping on his toes, and I said, 'Well, have you guys had any trouble or anything like that to lead up to this?' and he told me that he thought Buster had signed a complaint to get him raided on a whiskey charge, and I said, 'No, he didn't have anything to do with that',—I said, 'I am going to take you home if you will promise me you will stay at home', and he said, 'All right' * * *".

Witness said that later it was reported to him that defendant was returning to town and was then in a car in an alley leading to the abandoned filling station. Said he:

"A. Well, I went in around behind this abandoned filling station and was standing there in the dark, and Mr. Wyatt gets out of a car back at the alley, and he walked up near a pile of trash approximately ten or twelve feet from me, and about this time Mr. Long drives my car around the corner of the building and the lights shine on Mr. Wyatt, and he just laid down on the ground, and I walked up to him then and said, 'Well, Roy, what are you doing back here?', and he said, 'I came back after my pocket knife', and I said, 'You lied to me, you told me you were going to stay at home'.—and I said, 'You came back after this pistol,'—and he said, 'Red, did you find it?'.—he said, 'I had to come back and clean up the evidence.', and—

"Q. He said what? A. He said, '*I had to come back and clean up the evidence,*' and then we took him on down and put him in jail." (Emphasis supplied.)

Witness went on to testify that he took the serial number of the pistol and he examined the .45 automatic Colt in evidence and identified it as being the pistol he found and that he had testified about. He testified about a .45 automatic shell that he said was handed to him between the Dew Drop Inn and Carpenter's Cafe. The court considered the State deficient in laying a predicate for the introduction of the shell and it was not admitted.

C. P. Cunningham, undersheriff, testified that he was present on February 7, when the county attorney interviewed the defendant and heard him say that he had the .45 shell in question in his pistol and it would not go off. Of course if this was a voluntary statement, even though the defendant was under arrest, the statement would be competent. Coleman v. State, 70 Okl.Cr. 246, 104 P.2d 1004, 105 P.2d 431; Rowan v. State, 57 Okl.Cr. 345, 49 P.2d 791. But the record is not clear as to that. At any event, the officer could not remember whether or not the county attorney advised defendant as to his constitutional right to refuse to talk and would not admit the statement into evidence.

Officer Beauchamp recalled, testified that when he found the pistol there was ammunition in the clip, the hammer was back but there was no shell in the chamber. The clip, which he identified, was defective, having a split at the top where he said it appeared someone had tried to force a shell in the wrong way. He said that the clip was not one you would ordinarily purchase with that model Government pistol.

This ended the evidence of the State.

Counsel for defendant in his opening statement said that it was admitted that the gun in evidence belonged to the defendant, but that it was never out of his pocket. He said the evidence would only show that defendant slapped the prosecuting witness a few times for stepping on his feet.

The defendant did not testify, but offered the testimony of several witnesses.

Lorenzo Boykin, the first witness called for the defense, testified to seeing the defendant slap Buster Johnson at the time and place in question, and accuse him of stepping on his feet. He said that he did not see any gun. Witness further said there was a jam at the door, people trying to get out and when he got an opening he went out the front door and at that time he saw defendant with a gun in his hand and that defendant pushed this gun out at one Bud Johnson and told him "Get back off of me", and witness said at that time, "I ran on out."

Gabe Edwards testified substantially as witness Boykin, except he denied seeing a gun inside the cafe, or outside. He admitted on cross-examination that Buster Johnson, as "house man" in the pool hall at the Dew Drop Inn, had stopped him from shooting snooker there, but testified that had nothing to do with him testifying as he did.

Henry Richardson testified that he worked at the city hall at Watonga, stated that he knew the prosecuting witness Buster Johnson, but did not know about his reputation as being a peaceable or law-abiding citizen. He was excused as a witness.

Henry Jordan testified that Buster Johnson's reputation for being a peaceable and law-abiding citizen was bad. He said this knowledge was partly hearsay and some of his own knowledge.

Memorial Wyatt, wife of the defendant, testified that on the night of February 5, 1955 defendant's brother brought a pistol to her home for her husband, and then took it on up town to give to her husband.

This concluded the evidence for both the State and the defense.

If the witnesses for the State were believed, defendant could have by reason of snapping a loaded pistol pointed at the prosecuting witness, been charged with the greater crime of assault with intent to kill. But he was charged with the lesser crime of assault with a dangerous weapon.

We have read the entire record. The issues were fairly submitted to the jury. The jury believed the testimony of the witnesses for the State. No witness for the defendant categorically swore that the defendant did not pistol-whip Buster Johnson. Several just "did not see the pistol". As we have often said, a jury's determination upon a conflict in the evidence must be controlling on an appellate court and unless

there are errors of law appearing in the record, a jury's finding of guilty will be sustained on appeal where there is competent evidence to sustain such finding. Campbell v. State, Okl.Cr., 280 P.2d 758; Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527; Anson v. State, Okl.Cr., 269 P.2d 383; Beavers v. State, Okl.Cr., 282 P.2d 783. We have carefully read the cases of Williams v. State, 52 Okl.Cr. 336, 5 P.2d 410; Felder v. State, 47 Okl.Cr. 214, 287 P. 792; and Decker v. State, 44 Okl.Cr. 186, 279 P. 915, cited by counsel as precedents for modifying the within judgment.

It is claimed that the jury did not deliberate long enough to give careful consideration to the instructions given by the court. We find nothing in the record to show how long the jury deliberated. This court has many times held that matters occurring in open court during the progress of a trial must be placed in the casemade by recitals certified by the judge who presided at the trial of the case before the same will be considered by the criminal court of appeals. Jackson v. State, 86 Okl.Cr. 420, 193 P.2d 895.

From the evidence in this case, it was only by providence that defendant failed to kill the prosecuting witness or others in the crowded Inn. It was only by reason of the failure of the shells to explode and his pistol to properly function that prevented him from possibly being tried for murder. The fact that all the parties involved were colored people cannot cause a relaxation of the law. The trial judge heard all the evidence and observed the witnesses, and, there being no error in the record, nothing is presented that would justify or authorize this court in interfering with the verdict and judgment appealed from.

The judgment appealed from, therefore, must be, and is, affirmed.

JONES, P. J., and BRETT, J., concur.