Joe Junior CORTEZ, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13666.

Court of Criminal Appeals of Oklahoma.

Feb. 2, 1966.

Rehearing Denied June 20, 1966.

John Cooper, Wewoka, Charles Grounds, Seminole, for plaintiff in error.

Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Plaintiff in Error, Joe Junior Cortez, hereinafter referred to as defend-

ant, was charged by information in the Superior Court of Seminole County with the crime of Burglary Second Degree. He was tried by a jury, found guilty, and sentenced to Two Years in the penitentiary. From that judgment and sentence he has appealed to this Court asserting five propositions of error; the first being that the trial court erred in overruling Motion to Suppress Evidence for the reason that the defendant believed he had a binding promise of immunity from the county attorney.

From the record before the Court, it appears that the defendant, with Dale Eastep, was apprehended and charged with a burglary of Evergreen Mills in Pontotoc County. After several days, a deal was proposed by the county attorney of Pontotoc County to give immunity in Seminole, Hughes, and Pontotoc Counties if they would plead guilty in the case there and return the safe that had been stolen. This was done.

On pg. 34 of the casemade, the county attorney of Seminole County stated at the hearing on the Motion:

"My name is Frank H. Seay, I am the County Attorney for Seminole County and have been for the past year. And during this incident which this motion concerns and as Mr. Merryfield testified, at the time of this incident when Mr. Merryfield and the officers of this County were working on the robbery with the officers of Ada, the police department and also the officers of the city of Ada and our sheriffs department and police department were working close together and we thought we were working close together with the sheriff's department at Ada. We had talked several times with Lt. Braman, this is the detective on the Ada Police Department and with the Chief of Police and with Bob Macy, who was attorney for Dale Estep, then Estep hadn't been—he had been in some trouble but hadn't been in as near as much trouble as the Cortez boy, therefore we considered that if we could try to make some agreement with the Estep boy that we would make this agreement. But I talked with those people, with Lt. Braman, with the Chief of Police, with Bob Macy, Dale Estep's lawyer and there was an agreement in the making. Never once did Charles Grounds, Attorney for Joe Cortez come and talk to me about any kind of agreement. One afternoon I did call the County Attorney's office of Pontotoc County and ask him how they were getting along down there on the case. I suppose he also knew that Dale Estep was very near come to an agreement, as I questioned him awhile ago there seemed to be some element of mystery, he didn't seem to want to talk about it too much and I assumed that one of the defendants was in the room at the time, in fact, I asked him if one of the defendants was there and he didn't care to talk about it and he said no, and he said you think if we can make some deal will you go along with us, I assumed that the Sheriff's department and County Attorney's office and the City Police Department of Ada were getting along and that they were working hand in hand in this matter and that surely one department would tell the other what was going on, but evidently this hasn't happened, because as he testified, he didn't know anything about this Dale Estep matter. No names were mentioned as to who any deal could be made with, he did not say Joe Cortez, he did not say that such a thing as immunity would be given a man, because we certainly wouldn't have gone along with anything like that, and I talked with the Sheriff and the Deputy Sheriff and we certainly wouldn't have considered going along with granting Joe Cortez immunity, a man that had been in the penitentiary before, makes no difference what he had told us, that never entered my mind until Saturday morning I got down there and were informed by some officer then that the County Attorney intended to grant Joe Cortez immunity, I was shocked.

Q. (By Mr. Billingsley) Let me ask you one other question. Did you ever intend or did you ever tell anybody or give the impression that the County Attorney's office of this County would enter into an agreement to grant Joe Cortez immunity?

A. Now, I did have a conversation when I was at Ada with Francis Mayhue, I called him and my purpose there was to ask him what in the world he had done, he said that well, he thought that they were going to offer Joe Cortez immunity, and I was, as I said, shocked and I talked to him for awhile and he said, well, you think I made a mistake and I told him, yes, sir, I do think you made a mistake, I don't see how you could do that and we never, I don't think we discussed it, I don't think I told him that I still was going along with it. He thought maybe I might be bound by it, but I don't see how I could be bound by what he had promised him *when he hadn't talked to our judge here.* (Emphasis ours.)

Q. You made no promise to release Joe Cortez?

A. No, sure didn't.

Q. And you don't agree to it now?

A. No, I certainly do not."

Defendant contends that he was under the impression that he would be granted immunity in both counties, and cites Article II, § 27 of the Bill of Rights, which states:

"Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the State, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the State; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence."

In order for a person to secure immunity under the above section of Constitution on account of incriminating evidence given by him as a witness in any court, he must have testified under an agreement made with the prosecuting attorney, *approved by the court,* or he must have claimed the privilege of silence which must have been denied by the court and such person must have been compelled by the court to testify. See Coleman v. State, 70 Okl.Cr. 246, 104 P.2d 1004, 105 P.2d 431, modified on other grounds; Hunter v. State, 63 Okl.Cr. 24, 72 P.2d 399; Perry v. State, 84 Okl.Cr. 211, 181 P.2d 280; Tague v. State, 15 Okl.Cr. 55, 173 P. 1106; Eden v. State, 54 Okl.Cr. 265, 21 P.2d 775; and others.

This Court further held in the case of Barnett v. State, 23 Okl.Cr. 363, 214 P. 948:

"That defendant had been granted immunity from prosecution by reason of an agreement entered into between him and the county attorney, without the consent of the trial court, wherein the county attorney agreed that, if defendant would testify against two other parties whom the defendant claimed were jointly concerned with him in the crime of which he was convicted, he would not be prosecuted in such a proceeding, was no defense under this section." (Art. II § 27).

In the instant case, there was no agreement between the defendant and the trial court of Seminole County, nor between the defendant and the County Attorney of Seminole County. That the defendant may have been led to believe he had a binding immunity from the county attorney of Pontotoc County would not be error, as it is clear from the record that there was no grant of immunity within the meaning of the above section. And, further, the defendant did not, in fact, testify in the case in Pontotoc County.

However, the confession from defendant, since it was alleged to have been obtained by coercion, could have been raised by proper motion and objection, and presented

to the trial court for a ruling, and *if* it was determined that it was not freely and voluntarily made, it should have been excluded; or if admitted, submitted to the jury under proper instruction.

Defendant's second proposition is that the state failed to prove all the essential elements of the crime; to wit: the time of the occurrence. He alleges that the jurors were misled as to the date of the crime, referring to the jury returning to the courtroom after deliberating for some time and asking for the actual date of the crime, as there seemed to be a conflict as to whether it was the 28th or 29th as charged in the information. From the record before us, counsel for defendant was the one who urged the date of the 29th upon the jurors, stating:

"MR. GROUNDS: *Here it is, for the record, the 29th.*

THE JUROR: The morning of the 29th.

THE COURT: Just a minute. Charlie come up here. Well ladies and gentlemen, the information states that it happened on or about the 29th of April. I don't know whether the evidence discloses the hour or not, you've heard the testimony and you will remember.

THE JUROR: All we want to know is the morning Mr. Jackson discovered it, the morning whether it was the 29th or 28th or 39th, 29th or 30th, that is what we want to know.

THE COURT: Well, the information says the 29th.

THE JUROR: The morning of the 29th?

THE COURT: The 29th I don't know whether it was in the morning or afternoon.

MR. SEAY: That is when Jackson discovered it, the information says that, it doesn't say the hour.

THE COURT: It doesn't say the hour, morning or afternoon.

MR. SEAY: It doesn't disclose whether the robbery was on the 29th or the 28th.

MR. GROUNDS: *Let's have the—so as not to have any guess work let's have the reporter to read back the testimony of Mr. Jackson, he said he went down and discovered it at a certain date.*

THE COURT: Did he?

MR. GROUNDS: *I understood him to say it was the 29th.*

THE COURT: Well, if he did, we will read it and find out.

MR. GROUNDS: Court please, I would like for them to take the information itself.

THE COURT: Well, the information is incorporated in the instructions on the front page.

Thereupon the jury returned as a body to the Jury Room for further deliberations * * *." (Emphasis ours.)

If the jury was under any misunderstanding as to the date of the crime, defense counsel cannot be heard to complain, when he was the one who urged the date of the 29th upon them. They were furnished with the testimony of the witnesses, and the Information, and drew their own conclusion.

The affidavit signed by the foreman of the jury wherein she states that the verdict "hinged" on this one question of time of commission of the crime, is simply not supported by the record as quoted above. Public policy is well settled that an affidavit or testimony of a juror cannot be admitted to impeach his own verdict, or to show anything that transpired in a jury room during deliberations.

This Court has so held many times, also in the case of Green v. State, Okl.Cr., 281 P.2d 200:

"Testimony of juror for impeachment of verdict by member or members of jury is not permissible."

See, also, Harrell v. State, 85 Okl.Cr. 293, 187 P.2d 676; Killough v. State, 94 Okl.Cr. 131, 231 P.2d 381, 383; Martin v. State, 92 Okl.Cr. 182, 222 P.2d 534; Ex parte Lewis, 92 Okl.Cr. 334, 223 P.2d

143; Taylor v. State, Okl.Cr., 265 P.2d 733.

And, in the Killough case, supra, it was said:

"[J]urors will not be permitted to impeach or contradict their verdict by affidavits or otherwise after they have been discharged from the jury and mingled with the public."

■ Defendant's third proposition of error is that the trial court erred in giving Instruction No. 7, relating to the law on alibi. This assignment of error was not listed in the Motion for New Trial; and in the petition in error it stated only that the court did not give proper and sufficient instructions.

Further, there was not one objection nor exception to this instruction by defendant at the time it was given. Ordinarily, this Court would consider this allegation no further. Since it is basically a bad instruction, however, we will discuss it in the instant case. This does not necessarily mean it was prejudicial to the defendant, or that it constituted reversible error. The instruction complained of reads as follows:

"The defendant has interposed in this case as a defense what is known as an alibi; that is that the defendant was at another and different place at the time of the commission of the crime charged in the information, the law is that such a defense is proper and legitimate and the jury should consider all the evidence bearing upon this point whether introduced by the state or by the defendant, and if after careful consideration of all the evidence in the case, you entertain a reasonable doubt as to whether the defendant was at such *other place* when the crime was committed, then you should give the defendant the benefit of the doubt and acquit him." (Emphasis ours.)

The concluding part where the jury is told that if they entertain reasonable doubt as to whether defendant was in such *other place* at the time of the alleged commission of the crime, is what defendant contends

is error. He relies on the case of Stuart v. State, 35 Okl.Cr. 103, 249 P. 159, stating that the instruction is word for word the same, and that this Court held it to be error. Such is not the case.

Defendant only quotes part of the Stuart case, supra. Had he completed the paragraph, it would read as follows, in syllabus 5:

"The burden of proof is not shifted by the defense of alibi, and, if under the evidence the jury entertain a reasonable doubt of the presence of defendant at the time and place where the crime was committed, he is entitled to an acquittal. An instruction on the law of alibi should inform the jury that if they entertain a reasonable doubt of the presence of the accused at the time and place where the crime was committed, they should resolve the doubt in favor of the accused and acquit him. It is error to instruct the jury that if they entertain a reasonable doubt of his presence at the 'other place' instead of at the place where the crime was committed. Such error, however, may not be sufficiently prejudicial to require a reversal."

This Court recommended the correct form of instruction on the law of alibi in the Stuart case, supra, and we will not repeat it here. The Stuart case was reversed because of numerous errors, and the Court pointed out that none of the errors, standing alone, would constitute reversible error.

■ An instruction, improper and erroneous, will not be held reversible error where it is evident, on consideration of all instructions given, undisputed facts, and verdict of jury, that such instruction did not work to the prejudice of the defendant, or deprive him of any fundamental or substantial right.

We, therefore, do not deem this instruction to be reversible error in the instant case, but recommend that the same be discontinued in favor of the accepted instruction in the Stuart case, supra.

The record before the Court does not support defendant's fourth proposition, and

we will not discuss it, except to say that it is not properly raised.

Defendant's last contention of error that the conviction should not stand, as it is based on the uncorroborated testimony of an accomplice, is not well taken. The record at pg. 58 of the casemade, shows the admission of the defendant that he did burglarize the Western Novelty Company.

This Court has carefully reviewed this record, and do not believe that any of the contentions of defendant are of sufficient merit to cause a reversal of this cause.

For the reasons stated and law cited herein, the judgment and sentence of the trial court is hereby affirmed.

BRETT, J., and BUSSEY, P. J., concur.